THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EARL JONES, Defendant-Appellant.

First District (5th Division)   No. 1—86—3015

Opinion filed April 12, 1990.

938

Randolph N. Stone, Public Defender, of Chicago (Vicki Rogers, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Gael O'Brien, and Andrew LeFevour, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE COCCIA delivered the opinion of the court:

Defendant Earl Jones appeals his murder conviction in a 1985 jury trial. Following his arrest, defendant made oral and written statements to police admitting his role in the shooting of a fellow resident of his Chicago apartment building. He was subsequently indicted by a Cook County grand jury and tried on one count of murder, based on accountability. (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), 5—2(c).) Defendant's pretrial motions to quash his arrest and suppress his statements to police were denied. He was found guilty and sentenced to 20 years in the Department of Corrections.

On appeal, defendant raises three issues for our consideration. He contends that (1) police lacked probable cause for his warrantless arrest; (2) the trial court erred in finding that his statement to police was voluntary; and (3) the State's evidence did not establish his guilt, based on accountability, beyond a reasonable doubt. For reasons set forth below, we affirm.

At a hearing on defendant's motion to quash arrest, Chicago police detective Paul Carroll testified that he was assigned to investigate a homicide which occurred at 1:15 a.m. on July 29, 1984, in the hallway area of 1161 North Larrabee, which is a Chicago Housing Authority building. In the course of his investigation, he learned that the victim, Robert Morrison, had been found lying outside the doorway of apartment 502 at that address. A bicycle was also found lying on the fourth-floor landing of the stairwell.

Detective Carroll further testified that about 10:15 a.m. on July 30, 1984, he and Detective Anthony Graffeo interviewed Julius Perkins at an Area 6 police headquarters office. Perkins told the detectives that he was a resident of the building where the shooting took place and had been descending the stairs at the time the shots were fired. As Perkins started downstairs from the fifth floor, he passed the victim, who was coming up the stairs with a bicycle. Then he saw, at the fourth-floor level, three persons whom he recognized. He overheard these individuals talking about "offing" someone. Perkins said that he knew one of these individuals by the name of "Black Stan," and the others as "B.C." and "Earl." He told the detectives that Earl lived at apartment 805 in the building. He also said that Black Stan was holding a long-barreled gun in his hand. After continuing down the stairs, he saw B.C. fire the gun up the stairs, presumably at the victim. As B.C. fired, Black Stan was holding open the stairwell door and Earl was standing right next to B.C. After Perkins heard two shots, he heard these three persons running up the stairs. Then he

heard two more shots. Detective Carroll also stated that Perkins explained why he had earlier told police a different version of the story, namely, that he had heard three shots before he reached the first floor, but saw no one exit the stairwell. Perkins said that he knew Black Stan and B.C. from the neighborhood, knew that they were gang members, and was afraid of them. Carroll testified that he knew "Black Stan" as Stanley Rankins and "B.C." as Charles Young, and that he believed Perkins as to his reason for giving the earlier account. He also stated that he offered Perkins nothing and made no promise of protection in exchange for his information.

Detective Carroll further testified that following this conversation with Perkins, he contacted a public housing office and asked them to check their records. He was informed that the name assigned to apartment 805 at 1161 North Larrabee was "Baker." Unable to locate the name Earl Baker in police records, Carroll went to apartment 805 at that location, where he spoke to Mattie Baker. Mrs. Baker informed him that she had a son, Earl Jones, who was then on the west side of Chicago. Checking with his office, Carroll found that there was a record of an Earl Jones at the same 1161 North Larrabee address. Soon thereafter, Carroll was notified by a fellow police officer that the person he was looking for was standing in front of 1161 North Larrabee, wearing a purple pullover shirt and blue jeans. He immediately returned with three other officers, two of them in uniform, to that location, where they observed the defendant wearing the clothing described. He further testified that defendant looked in the direction of the officers, and then "broke and ran" to the stairway of the building and up to the third floor. When Detective Carroll caught up with defendant on the third-floor landing, he asked his name. Carroll recalled that defendant first replied that his name was Earl, or possibly Edwin, Baker, and then, in response to Carroll's question, said that he also went by the name Earl Jones. Carroll later stated, on cross-examination, that either he or his partner asked defendant if he lived in apartment 805, and defendant replied that he did. Carroll then placed defendant under arrest and drove him to Area 6 police headquarters.

Chicago police detective Anthony Graffeo also testified at the hearing on the motion to quash arrest. His testimony corroborated Carroll's in that he recalled being present with Carroll at the July 30, 1984, interview with Julius Perkins, and stated that Perkins had told them that the person named "Earl," whom he had seen on the stairway when the shooting took place, lived at 1161 North Larrabee, apartment 805. Detective Graffeo also stated that he later accompa-

nied Carroll to apartment 805 at that address and spoke to defendant's mother, who told the detectives that she had a son on the west side of Chicago by the name of Earl Jones. He further recalled that Carroll then checked with his office and learned that police arrest cards listed an Earl Jones at 1161 North Larrabee. Graffeo admitted that nowhere in a police report prepared and signed by him, which summarized the July 30 conversation with Perkins, was there a statement indicating that Perkins mentioned a specific apartment number or even a floor where Earl lived. On cross-examination, Graffeo agreed that his report included a statement that Perkins told him "[h]e had lift [sic] his apartment on the 5th Floor and was walking down the stairs when he saw Earl, whom he knows from the building he resides in."

Testifying at a later hearing on defendant's motion to suppress statements, Detective Graffeo gave an account of what transpired after Jones arrived at the police station. Graffeo stated that about 1:20 p.m., he placed a telephone call to defendant's mother, using the number which Mrs. Baker had given to police, but was unable to reach her. At about 1:30 p.m., he and Detective Carroll interviewed defendant after Graffeo read defendant's *Miranda* rights from a police handbook. Graffeo further stated that he asked Jones whether he understood each right as it was read to him and that defendant answered in the affirmative. He then asked defendant whether he wished to answer questions, and defendant replied that he did. Before proceeding with the interview, which lasted about 15 minutes, Graffeo also told Jones that although he was a juvenile and under the age of 17, he would be charged as an adult if charged with murder, armed robbery with a gun, or rape. He also testified that he asked defendant whether he wished to have his parents notified, and defendant stated that he did not. About 2:30 p.m., prior to a second, 20-minute interview, Graffeo once again advised defendant of his constitutional rights, which Jones said he understood. The detective acknowledged that he did not repeat at this time the admonition about defendant being chargeable as an adult for certain crimes. Only Graffeo, Carroll, and the defendant were present for the second interview. The detective further stated that at no time during the first or second interview did he or anyone in his presence strike the defendant in the face. He also testified that at no time during either conversation did he exercise any mental or psychological coercion or confront Jones with any misrepresentations about the homicide.

On cross-examination, Detective Graffeo stated that he and Carroll left defendant alone in the interview room between the 1:30 p.m.

and 2:30 p.m. conversations. He further testified that during the second interview, he asked defendant if he wanted something to eat or drink, but Jones declined the offer. Defendant did ask to use the washroom and was allowed to do so. Graffeo also acknowledged that after 1:20 p.m., he made no further attempts to contact defendant's mother.

Assistant State's Attorney George Velcich also testified at the suppression hearing. He stated that on July 30, 1984, at approximately 8:35 p.m., he interviewed defendant at Area 6 police headquarters. Detective Graffeo and Chicago police department youth officer James Riordan were also present for this interview. Velcich stated that he first informed Jones that he was a lawyer, but not his lawyer, and that he worked with the police. He then advised defendant of his *Miranda* rights. Velcich further testified that he told Jones that he could be charged as an adult if he were charged with murder, armed robbery, rape, or deviate sexual assault. For other crimes, he could still be charged as a juvenile. Velcich also stated that Jones never said that the police had slapped him and made him talk.

The assistant State's Attorney further testified regarding a second conversation with defendant at about 10:15 p.m. He stated that he and Jones were alone at that time, his purpose being to discuss in private how defendant had been treated by the police. Velcich recalled that defendant told him that the police had treated him "fine" and that he had no complaints. Velcich then explained to defendant how his court-reported statement would be taken. He further stated that during his interviews with Jones at 8:30 p.m. and 10:15 p.m., he noticed no bruises or marks on defendant's face.

On cross-examination, Velcich testified that prior to the 8:30 p.m. conversation with defendant, he had reviewed available police reports on the case with investigating officers and understood that it was a homicide case. He also stated that he knew, at the time, that under the relevant statute, a person over the age of 15 who is charged with murder must be tried as an adult and that there was no possibility that such person could be tried as a juvenile for that offense. Velcich was shown a report of his 8:30 p.m. interview with defendant, prepared for his felony review supervisor. He agreed that the report nowhere reflected that he specifically advised Jones that if he were charged with murder, he would be tried as an adult. However, he explained that the report was a summary which did not detail each *Miranda* right or each crime mentioned. He further acknowledged that at the time defendant's court-reported statement was taken, he asked Jones if he understood that he could be tried, in these words,

"as an adult for some crimes and as a juvenile for other crimes." He admitted that he did not specify, at the time of the written statement, the crimes, such as murder, for which a 15-year-old defendant would automatically be tried as an adult.

Velcich further explained that at the 8:30 p.m. interview, Jones indicated that he wanted to speak with his mother. Velcich instructed Detective Graffeo to permit defendant to make the call, which Jones dialed himself. Defendant then reported that he had spoken with his mother and resumed his conversation with Velcich. The assistant State's Attorney also stated that at no time during these interviews did he ask Jones to sign a waiver-of-rights form. He testified that defendant's court-reported statement began at 12:30 a.m. on July 31, 1984. The signing of the transcribed document occurred at approximately 2:35 a.m.

On redirect examination, Velcich clarified that Jones spoke to his mother before he gave an oral statement to him. At the time Velcich took the statement, and at every other time except during his private conversation with Jones about police treatment, youth officer Riordan was present. Velcich also stated that he never told defendant that he would be tried as a juvenile.

Defendant gave the following testimony in support of his motion to suppress. He stated that at the time of his arrest on July 30, 1984, he was 15 years old, had completed the seventh grade, and lived with his mother, Mattie Baker, at 1161 North Larrabee. Following his arrest, when he admittedly ran from the police, he was handcuffed and driven to the police station. Defendant further stated that at 1:30 p.m., Detectives Graffeo and Carroll entered the room where he had been handcuffed to the wall. Graffeo read the *Miranda* warnings to him, but the only right which he understood was the right to remain silent. He further testified that no one mentioned notifying his mother. However, he did not tell either of the detectives that he did not want her notified. He recalled Detective Graffeo telling him, in defendant's words, that "you would be charged as an adult if you committed these crimes." Jones stated unequivocally that no one slapped him at the 1:30 p.m. interview, but that Detective Carroll slapped him twice at the 2:30 p.m. interview. He further stated that neither detective read his rights at the 2:30 p.m. interview. He related that the first thing said to him during that conversation was, "We got you now, you are the shooter." He also asked the detectives if he could use the washroom and was allowed to do so. During the second interview, nothing was said about notifying his mother.

Defendant further testified that between the 2:30 p.m. interview

and his conversation with the assistant State's Attorney at 8:30 p.m., he was alone in the room, handcuffed to the wall. When Velcich arrived, defendant's handcuffs were removed and he was again advised of his rights. Defendant recalled that Graffeo and another officer were also present at this time. He further stated that he asked Velcich if he could call his mother, and that Velcich instructed Detective Graffeo to let him telephone her, which he did. After he spoke to his mother, he spoke with Velcich. He also recalled that he was given a sandwich and some soda pop. At about 10:15 p.m., Velcich returned and conducted a private conversation with him. Defendant stated that during this conversation, he told the assistant State's Attorney that a police officer had slapped him. He further testified that Velcich then walked out of the room, and Detective Carroll and "the other detective" came in. According to defendant, Carroll then said, "I told you not to tell him." Then the detectives left and Velcich returned. Velcich asked him if any officers had slapped him, and defendant told him they had not. Jones further testified that at 12:15 a.m., he was taken into a room where Velcich, Graffeo, and a court reporter were present. After his statement was taken, he was returned to his room until about 2:15 a.m., when Velcich came into the room with Graffeo and another officer. Velcich then asked him to sign certain papers, which he signed at about 2:35 a.m.

On cross-examination, Jones stated that he never told Detective Graffeo that he did not want his parents notified. He acknowledged, however, that he never indicated that he wanted a lawyer to be with him. He also admitted that he did not ask the police for anything to eat or drink at the 2:30 p.m. interview, which was a short conversation. He stated that Detective Carroll struck him twice under his eye, with the back of his hand, during that interview, and further stated that Carroll told him that if he "flip-flopped the story," he [Carroll] was going to take him back to the building and "let them kill me." Defendant acknowledged that Carroll said nothing else and that Graffeo did not threaten him. He also recalled that Graffeo told him that he would be charged as an adult if he were "charged with the crime," and that neither officer told him at any time that he would be charged as a juvenile. He further testified that he was not handcuffed when he used the washroom during the 2:30 p.m. interview, and that he was able to drink from a water fountain on his way back to his room.

On further cross-examination, defendant substantially corroborated Velcich's testimony relating to hearing his *Miranda* rights, then speaking with his mother, and then returning to the interview room

and telling Velcich that he would answer some questions. Defendant stated that he spoke to his mother for about three minutes and that he told her that he was at the police station. He further testified that no one threatened or struck him during the 8:30 p.m. interview. Defendant also testified that he spoke privately with youth officer Riordan at about 8:40 or 8:50 p.m., after meeting with Velcich. He did not tell the youth officer that anyone had slapped him or threatened him.

With regard to his court-reported statement, defendant testified that Detective Carroll was present when it was taken, but that the youth officer was not. He further stated that at 2:15 a.m., Velcich showed him all 10 pages of his statement, but asked him to read it by himself, not aloud. He also testified that Velcich did not give him a pen to make additions or corrections by himself; instead, he made corrections only as directed by Velcich. Asked if he could read, Jones first stated that he could not read "too good," and then said that he could not read. He admitted that he could write and spell his own name, and that he did write in some corrections on his statement, but said that Velcich told him what to write and how to spell some of the words. Jones further acknowledged that, prior to his arrest, he had been in court for juvenile proceedings and had spent some time in a facility of the juvenile division of the Department of Corrections. On redirect examination, defendant testified that although he understood everything that Velcich asked him at the time of his court-reported statement, he nonetheless believed that he would be tried as a juvenile. He also stated that the police told him that to be tried as an adult meant that he could "get up to 20 years or so."

A Chicago Public Schools counselor adjustment teacher, identified only as Mrs. Mozdzierz, also testified at the suppression hearing. She stated that official school records showed that in May 1982, defendant's reading comprehension score on the Iowa skills test, a standardized test of basic skills, was 2.9. According to the witness, this score indicated that two years before his arrest, defendant's reading comprehension was that of a second grader at the ninth month of the school year. Mozdzierz further testified that she had no knowledge of any later test scores or of defendant's actual reading comprehension level at the time of his arrest.

James Riordan, a Chicago police department youth officer, testified for the State in rebuttal. He recalled that on July 30, 1984, at approximately 4 p.m., he spoke with the defendant at Area 6 police headquarters. Riordan stated that he and Jones were alone for this conversation. Riordan further testified that he told defendant that he

was a youth officer assigned to his case, but would not be processing his case. He also advised defendant that he would probably be charged with murder as an adult. When he asked Jones if his parents knew that he was at the police station, Jones replied that they did. Riordan further stated that he asked defendant if he would like him to telephone defendant's mother, and that Jones declined the offer. Defendant also declined Riordan's offer of food and drink. Defendant told Riordan that the detectives involved in the case had advised him of his rights. The youth officer further testified that he recalled seeing no bruises or marks on defendant's face. On cross-examination, Riordan admitted that he did not personally advise defendant of his *Miranda* rights; nor did he attempt to contact defendant's mother. He stated that he had no other private conversations with Jones during his time in custody.

Assistant State's Attorney Velcich was also recalled by the State to testify in rebuttal. He stated that only Jones, Detective Graffeo, youth officer Riordan, and the court reporter were with him for the taking of defendant's written statement. Detective Carroll at no time ever appeared in the room or participated. He further testified that Jones answered all his questions appropriately and that he did not have to repeat any questions. Nor did Jones ask him to explain any questions. He further stated that when the transcript of defendant's court-reported statement was completed, he asked defendant to read the statement aloud. He then gave defendant a pen and told him that he could make whatever changes or corrections he wished. Velcich further testified that Jones read the statement aloud, and made some corrections, and that he told defendant how to spell some misspelled words, but he did not tell Jones what to write. Asked whether defendant had any difficulty reading the transcribed statement, Velcich answered that there were some longer words that Jones could not pronounce and that he had to assist defendant in reading certain words.

Regarding his private conversation with Jones at 10:15 p.m., Velcich's testimony contradicted that of the defendant. Velcich stated that he asked Jones if he had been treated well by the police and if he had any complaints. Jones answered that he had been treated well by the police and had no complaints. Velcich also stated that defendant, during this conversation, never told him that he had been struck by the police officers and never told him that the police had made him talk. Velcich also stated that at the time he interviewed defendant, he knew that youth officer Riordan had spoken with Jones before he arrived.

At the conclusion of testimony on the motion to suppress, the

court received into evidence, for purposes of that motion, two police photographs of defendant taken during his time in custody. Nothing in the record suggests that either photograph revealed any injuries, bruises, or marks on defendant's face or elsewhere on his body. Following arguments by counsel, the court stated its findings and denied defendant's motion.

The following testimony, received at defendant's trial, is also pertinent to this appeal. We parenthetically note that Detective Carroll's trial testimony pertained solely to the background and facts of defendant's arrest, and was entirely consistent with his earlier statements at the hearing on the motion to quash. Detective Graffeo did not testify at trial.

Chicago police officer Pasquale Mattera testified that on July 29, 1984, at approximately 1:25 a.m., he was called to 1161 North Larrabee by his superior and arrived there three minutes later. He observed a yellow bicycle standing against the wall at the fourth-floor landing of the north stairwell, and a trail of blood leading out of the north stairwell and proceeding down the fourth-floor ramp to the south stairwell entrance, and from there up the south stairwell to the fifth floor. Officer Mattera observed Robert Morrison's body at the end of the hall on the fifth floor, lying in front of apartment 502, with two gunshot wounds to the back.

Dr. Yuksel Konacki, an assistant Cook County medical examiner, testified that he performed an autopsy on Robert Morrison on July 29, 1984. His examination revealed two bullet entrance wounds on the right side of the victim's back, about one inch apart, and two exit wounds on his right upper chest. He further testified that both bullets traveled through the body on an upward projectory. Dr. Konacki's expert opinion was that Morrison's bullet wounds were the sole cause of his death.

Mattie Baker's testimony revealed that two white male police officers came to her home at about noon on July 30, 1984. The officers inquired whether she had a son named Earl Jones, but she was unable to tell the officers where he was at the time. Mrs. Baker further stated that she "d[id]n't recall" if any police officers contacted her by telephone on July 30, 1984. She did remember receiving a telephone call from her son at approximately 8:30 p.m. on July 30, 1984, and stated that she spoke with him then.

Mary Hunt, defendant's aunt, testified that on the afternoon and night of July 28, 1984, she and the defendant attended a fair. After leaving the fair, Hunt drove defendant to his home at 1161 North Larrabee, and dropped him off at 1 a.m. on the street behind that

building. She stated that she drove away from the area immediately and did not notice where defendant went after he left her car. She further testified that she observed no other persons behind the building at that time.

Velcich's trial testimony corroborated his pretrial statements. He specifically told the jury that at the time of his first interview with defendant, he first advised Jones of his rights, and then allowed him to speak privately with his mother for about 10 minutes. Only when defendant returned, and said that he was willing to answer questions, did Velcich discuss the homicide with him for about 10 to 15 minutes. He also testified that after defendant's statement was transcribed, Jones had "very little difficulty" reading it aloud.

The transcript of defendant's court-reported statement to police, including several handwritten corrections, was admitted into evidence. After copies were distributed to the members of the jury, the statement was published to the jury by Velcich. The document states that Velcich, Detective Graffeo, and youth officer Riordan were present for the recording of the statement, which began at 12:30 a.m. on July 31, 1984. It further reveals that Jones first acknowledged understanding each of the *Miranda* rights as it was read by Velcich, and then stated that he was 15 years old, in the eighth grade, and could read and write English. Defendant further stated that he had been a member of the Black Gangster Disciples gang for two years and that Stanley Rankins and Charles Young held higher ranks in that gang.

Defendant's transcribed statement continues with the following account of the crime for which he was charged. At about 1:15 a.m. on July 29, 1984, Jones was standing on the first floor of 1161 North Larrabee, where he lived in apartment 805. At that time the building was controlled by the Black Gangster Disciples gang. Rankins and Young, who was also called B.C., were nearby, having a conversation. Rankins told Young that a man known as "Nigger Bobby" was supposed to come through the area wearing gray pants and a white shirt, and riding a bicycle. Defendant also heard Rankins tell Young that "they [were] supposed to shoot him" because he was a member of the Cobra Stones, an enemy gang. Defendant did not know whether the person being discussed was really a Cobra Stone, but he knew that the person lived in the building at apartment 502. Defendant saw Rankins give Young a black revolver. Then Rankins told defendant to "watch the building and whistle if [he] saw the police." At this point in the transcribed statement, the words "I say okay" had been added, in handwriting, along with the initials, "E.B." The next portion of the statement reads as follows:

"Q. [Mr. Velcich]: What were you supposed to watch out for?

A. [Defendant]: Watch out for the police.

Q. Why were you supposed to whistle when you saw the police?

A. To warn them to run, sir.

Q. So they wouldn't get caught by the police?

A. Wouldn't get caught, right.

Q. After that did you see Nigger Bobby?

A. Yeah. He had came [sic] in the building and started his way upstairs."

Defendant then stated that the victim was wearing a white tee shirt and that some food bags were strapped to his yellow bicycle. Rankins started to walk upstairs, while Young "ran behind him with a gun." Defendant also related that "Charles [Young] fixin [sic] shooting him by the time he hit the second floor, but someone else was coming down and could, you know, stop them from shooting." At this point Rankins and Young ran around to another stairway and "tried to beat [the victim] up there," while Jones immediately "ran up [the stairway] behind the man." The transcript then reads as follows:

"Q. [Mr. Velcich]: Before they ran up did you stay there and watch for the police?

A. [Defendant]: As soon as they took off, I took off.

Q. Before they left were you watching for the police?

A. Yeah."

By the time that defendant was nearing the third floor, the victim had almost reached the fourth floor. Jones stated that he was walking slowly because he did not want Morrison to see him. Jones then observed "Stanley and B.C. coming off the third floor." B.C. pointed the gun and shot twice. Morrison dropped the bicycle. As Rankins said, "Get him," Morrison ran through the fourth floor into the other stairwell and then up toward the fifth floor. Rankins and Young "chased up the stairs behind him." As soon as defendant heard another shot, he "ran upstairs, grabbed [Morrison's] food bags, and *** went on in the house." When defendant arrived at his apartment, he placed the food, some chicken and ribs, in the stove for a short time and then ate it.

After giving this account, defendant further stated that he had spoken to his mother and to a juvenile officer while in custody, that the police had treated him "right," that he had been given something to eat, and that no one had made any threats or promises to make him give his statement, which was given of his free will. He also acknowledged that he understood that he could be "tried as an adult for

some crimes and a juvenile for some crimes." Defendant's signature appeared on each page of the transcribed statement. The initials of Velcich, Graffeo, and Riordan appeared on the first nine pages, and their signatures on the final page. In addition to "I say okay" the other handwritten and initialled corrections were two insignificant typographical changes, the addition of the word "tips" to describe Morrison's food as "rib tips," and the added sentence, "I used the washroom."

Velcich further testified that when Jones was reading his statement aloud before he signed it, and had reached the section where he was being told by Rankins to whistle if the police came, Velcich asked Jones if he had said anything. Defendant answered, "I said okay," and then asked Velcich if he should write it down. Velcich told him that "if that is what happened" and if he wanted to write it down, he should write it and add his initials.

Defendant testified at trial that he was never asked to read the statement aloud and that he never even read it silently. He stated that after Velcich showed him the pages, Velcich told him to write down whatever he [Velcich] told him to write. Jones acknowledged that the words "I say okay" were in his handwriting and were followed by his initials. However, he testified that he never actually told Velcich that he had said these words and he wrote them only because the assistant State's Attorney so directed. He further stated that he never offered to act as a lookout on July 29, 1984. Rankins had said to him, "I want you to lookout. Whistle if you see the police." But defendant said nothing at all in response because he was frightened, as he lived in the building which Rankins and Young controlled. Defendant further stated that he never watched for police or gave any warning to Rankins or Young. He followed Morrison up the stairs because he was "going home."

On cross-examination, Jones stated that when he arrived at the building about 1 a.m. on the date in question, he intended to go straight home, but stopped "by Rankins and Young, who were standing by the stairs," conversing about the victim. When he walked up the stairs behind Morrison, it was not to follow him, but only to reach his apartment on the eighth floor. Defendant admitted that he never warned Morrison or indicated to him that something was wrong, although he had seen the gun and knew that Young was going to shoot Morrison. He further stated that he saw no gun in Morrison's possession. He also admitted that he ran past Morrison's bicycle on his way upstairs, took the food from it, and ate the food in his apartment. After the incident, he did not notify the police. With regard to his tran-

scribed statement, he testified that Velcich kept asking him "over and over again" if he was watching out for the police, and that he had given Velcich "a couple of answers saying 'no' " before he gave the affirmative response, "yeah." He agreed, however, that no negative response appeared in the transcript and that he did understand the questions which Velcich asked.

OPINION

## I

Defendant first contends that the State failed to establish that the information received by the police was reliable and sufficient to establish probable cause for his arrest. He maintains that the trial court erred in finding that his warrantless arrest was lawful and argues that his motion to quash arrest should have been granted. We disagree.

Section 107—2 of the Code of Criminal Procedure of 1963 provides that a valid arrest may be made when a warrant has issued or there are reasonable grounds to believe that the person arrested is committing or has committed a crime. (Ill. Rev. Stat. 1983, ch. 38, pars. 107—2(1)(a), (c).) "Reasonable grounds" and "probable cause" are synonymous for purposes of arrest, and the legality of an arrest is tested by the presence or absence of probable cause, not by the presence or absence of a warrant. (*People v. Tyler* (1984), 128 Ill. App. 3d 1080, 1087, 471 N.E.2d 968, 974.) Generally, a police officer has probable cause to arrest an individual when the totality of facts and circumstances within his knowledge would justify the belief, in a person of reasonable caution, that the person arrested has committed an offense. (*People v. Montgomery* (1986), 112 Ill. 2d 517, 525, 494 N.E.2d 475, 477; *People v. Hattery* (1989), 183 Ill. App. 3d 785, 819, 539 N.E.2d 368, 391.) While a mere suspicion by the officer is not sufficient (*People v. Lee* (1986), 151 Ill. App. 3d 510, 518, 502 N.E.2d 399, 404), probable cause may be founded upon evidence which would not be admissible at trial and which need not be sufficient to establish guilt beyond a reasonable doubt (*People v. Green* (1980), 88 Ill. App. 3d 929, 932, 410 N.E.2d 1003, 1006). Whether the necessary probability of criminal activity exists is governed not by technical legal rules, but by commonsense considerations that are factual and practical. (*People v. Tisler* (1984), 103 Ill. 2d 226, 248, 469 N.E.2d 147, 153.) A reviewing court will not disturb a trial court's ruling on a motion to quash an arrest for lack of probable cause unless it is manifestly erroneous (*People v. Stachelek* (1986), 145 Ill. App. 3d 391, 399, 495

N.E.2d 984, 989), and our task on review is simply to ensure that the trial court had a substantial basis for concluding that probable cause existed (*People v. Tisler* (1984), 103 Ill. 2d 226, 248, 469 N.E.2d 147, 158).

▉▉▉ In the case at bar, the facts and circumstances within the knowledge of Detective Carroll at the time he arrested defendant are determinative of whether probable cause existed. Most of the facts and circumstances known to Carroll were the result of his interview with Julius Perkins. The rule is that information relied upon to establish probable cause must be supported by some indicia of reliability. (*People v. James* (1987), 118 Ill. 2d 214, 222, 514 N.E.2d 998, 1002.) In a recent decision, our supreme court further clarified the law with regard to determining the reliability of information supplied to police by informants. (*People v. Adams* (1989), 131 Ill. 2d 387, 546 N.E.2d 561.) The court observed in *Adams* that, traditionally, courts have accorded greater credibility to so-called citizen informants, who have been witnesses to crimes and who act with the intent to aid the police in law enforcement efforts rather than for any personal gain or payment. (*Adams*, 131 Ill. 2d at 397, 546 N.E.2d at 565-66.) On the other hand, where an informant has been paid, courts have looked to whether the informant had previously established a pattern of providing reliable information to police. We also note that Illinois appellate opinions have sometimes stated this preference in terms of a presumption, *i.e.*, absent indications of payment, it is presumed that an informant is a citizen whose information has inherent reliability. (See, *e.g.*, *People v. Hall* (1987), 164 Ill. App. 3d 770, 776, 518 N.E.2d 275, 280; *People v. Mitchell* (1984), 123 Ill. App. 3d 868, 874-75, 463 N.E.2d 864, 870.) However, the supreme court in *Adams* unequivocally stated that, while the basis of the informant's knowledge is indeed relevant (*i.e.*, whether it is based on his being a victim or witness or whether he is a reliable paid informant), "the rigidity embodied in the presumptions concerning the classifications is no longer applicable. * * * Thus, based on an evaluation of all of the information available, including the source of the information, the question is one of whether there is probable cause to believe that the individual in question is involved in criminality." *Adams*, 131 Ill. 2d at 398, 546 N.E.2d at 566.

▉▉ Applying these principles to the facts of the case before us, we first find that there is no evidence whatsoever indicating that Perkins was a paid police informant, either previously or on the occasion in question. Instead, the unrebutted testimony of Detectives Carroll and Graffeo established that Perkins gave his information as a private citizen who was both a resident of the building where the crime oc-

curred and an eyewitness to the crime. While Perkins' status as a citizen informant and eyewitness does not, by itself, make his statement presumptively or inherently reliable (*Adams*, 131 Ill. 2d 387, 546 N.E.2d 561), the record reveals that his information was supported with additional indicia of reliability. First, Perkins' account was quite detailed in describing the circumstances of the crime and identifying the individuals involved. Furthermore, some of Perkins' information was independently verified prior to defendant's arrest. Carroll and Graffeo both testified that they encountered, in apartment 805, a woman who said that she had a son named Earl Jones. Checking police arrest records, Detective Carroll then found a record for an Earl Jones at the same address where the woman lived and where the crime had occurred. While the absence of a specific apartment number or floor number from the police report, and other minor discrepancies between the report and the detectives' in-court testimony, may raise a question of credibility, the trial court resolved this question adversely to defendant, and we will not substitute our judgment for that of the trial court in determining credibility of witnesses absent palpable error. (*People v. Stachelek* (1986), 145 Ill. App. 3d 391, 400, 495 N.E.2d 984, 990.) Finally, Detective Carroll testified that, just prior to defendant's arrest, when defendant was standing outside that same 1161 North Larrabee building, he "broke and ran" as soon as he looked in the officers' direction. He continued to run until Carroll caught up with him on the third floor of the stairway. This account was later corroborated by the defendant's own testimony. It is well established that a defendant's flight from police can be considered as an additional factor in determining probable cause. (*People v. Stamps* (1982), 108 Ill. App. 3d 280, 290, 438 N.E.2d 1282, 1290; *People v. Addison* (1977), 56 Ill. App. 3d 92, 97-99, 371 N.E.2d 1025, 1029-30.) Therefore, based on the totality of facts and circumstances known to Detective Carroll at the time he arrested defendant, we find that a person of reasonable caution having this knowledge would believe that defendant had committed an offense. Accordingly, we cannot say that the trial court's denial of defendant's motion to quash was manifestly erroneous.

## II

Defendant next contends that his age, intellect and confusion concerning his rights, along with physical and mental coercion by the police, rendered him incapable of giving a knowing and intelligent waiver of his constitutional rights. He therefore argues that the trial court improperly denied his motion to suppress and that his state-

ment to police should not have been admitted into evidence.

■■■■ The standard for determining voluntariness is firmly established in Illinois law. Whether a statement is voluntarily given depends on the totality of the circumstances. The test for voluntariness is whether the statement was made freely and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed. (*People v. Clark* (1986), 114 Ill. 2d 450, 457, 501 N.E.2d 123, 126; *People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606.) The question of whether a confession is a product of free will must be answered on the facts of each case because no single fact is dispositive. (*Brown v. Illinois* (1975), 422 U.S. 590, 603, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261.) Factors which the court may consider in determining voluntariness include the defendant's age, intelligence, background, experience, mental capacity and education, physical condition at the time of questioning, duration and legality of detention, and any physical or mental abuse by police, including the existence of threats or promises. (*People v. Hattery* (1989), 183 Ill. App. 3d 785, 821, 539 N.E.2d 368, 392-93.) The voluntariness of a confession need not be proved beyond a reasonable doubt, but the State has the burden of showing by a preponderance of the evidence that a statement was made without compulsion of any sort. (*Hattery*, 183 Ill. App. 3d at 821, 539 N.E.2d at 393.) A trial court's finding that a statement was voluntary will not be disturbed on review unless it is contrary to the manifest weight of the evidence (*Prim*, 53 Ill. 2d at 70, 289 N.E.2d at 606), and the reviewing court may consider the whole record, including trial testimony, in making its determination (*People v. Rendleman* (1978), 57 Ill. App. 3d 459, 463, 373 N.E.2d 509, 511).

■■■ While the above tests and standards apply to both juvenile and adult confessions (*People v. Prude* (1977), 66 Ill. 2d 470, 363 N.E.2d 371; *People v. Knox* (1989), 186 Ill. App. 3d 808, 812, 542 N.E.2d 910, 913), our supreme court has also recognized that the receiving of an incriminating statement by a juvenile is a sensitive concern requiring great care, in the absence of counsel, to assure that the admission was neither coerced nor suggested, nor the product of ignorance of rights, fright or despair. (*People v. Knox*, 186 Ill. App. 3d at 812, 542 N.E.2d at 913, citing *People v. Prude*, 66 Ill. 2d at 476, 363 N.E.2d at 373, and *People v. Simmons* (1975), 60 Ill. 2d 173, 179-80, 326 N.E.2d 383, 386.) The question before us is whether, considering the totality of the circumstances surrounding defendant's statement, the trial court's determination, that his statement was voluntary, was against the manifest weight of the evidence.

■■ ■ Each of the factors relevant to the court's determination of voluntariness will be considered in turn. We first address defendant's allegations of physical abuse during the 2:30 p.m. interview with Detectives Carroll and Graffeo. Jones testified that Carroll slapped him twice. This testimony was contradicted by Graffeo, who stated that at no time did he or anyone in his presence strike the defendant. Youth officer Riordan stated that when he spoke privately with Jones about 1½ hours after the alleged slapping, he saw no bruises or marks on defendant's face, nor did defendant report any abuse. Assistant State's Attorney Velcich testified that defendant never told him, at the 10:15 p.m. private interview, or at another time, that he had been slapped by the police. Defendant's testimony, that Velcich left the room momentarily so that Carroll could warn him not to mention the slapping, after he had already reported it to Velcich, directly contradicts Velcich's statements. As often occurs, the testimony of defendant and several State's witnesses was irreconcilably conflicting and raised a factual question for the court to decide. As our supreme court has held, where the only evidence of physical coercion is the defendant's testimony, and where this is contradicted by State's witnesses, the trial court may choose to believe the latter, and its superior position to evaluate the witnesses' credibility makes a reviewing court reluctant to reverse its determination. (*People v. Wilson* (1987), 116 Ill. 2d 29, 40, 506 N.E.2d 571, 575, citing *People v. La Frana* (1954), 4 Ill. 2d 261, 267, 122 N.E.2d 583, 586.) Here, the trial judge expressly stated that she had considered the testimony of defendant and the other witnesses, along with defendant's written statements pertaining to his treatment by police, and the photographs, in concluding that the State had met its burden of proving, by a preponderance of the evidence, that the confession was voluntary. We cannot say that this finding was against the manifest weight of the evidence.

■■ Defendant maintains, however, that his conviction should be reversed because the State failed to call Detective Carroll to rebut defendant's allegations, specifically his claim that Carroll threatened him not to tell Velcich, at the 10:15 p.m. interview, about the slapping which had occurred earlier. The well-established rule is that where the voluntary nature of a confession is in issue, the State must produce all material witnesses connected with the taking of the statement or explain their absence. (*People v. Armstrong* (1972), 51 Ill. 2d 471, 476, 282 N.E.2d 712, 715.) The purpose of the requirement is to compel the State to produce those officers who were witnesses to, or who had a role in procuring, the making of the contro-

verted statement. *People v. Glanton* (1975), 33 Ill. App. 3d 124, 140-41, 338 N.E.2d 30, 45.

A careful review of the record before us reveals that all material witnesses to the procuring of Jones' statements, including Detective Carroll, appeared and testified at the hearing on his motion to suppress. Unfortunately, the record on appeal is incomplete in that the transcript of Carroll's testimony on this motion was for some reason not included. Nonetheless, it is clearly evident from the transcripts and other documents in the record that Carroll testified, and was cross-examined by defense counsel, regarding his interaction with defendant during police interviews. The record discloses that on November 19, 1985, defendant's written motion to suppress statements was filed with the circuit court. That motion alleged with specificity the occurrences of slapping and verbal coercion to which Jones personally testified on November 22, 1985. The half-sheet entry for November 19 is also specific in noting that testimony was heard on Jones' motion to suppress and was continued to November 20, 1985. On November 20, Detective Graffeo's testimony was completed and Velcich's began. On November 22, at the conclusion of Velcich's testimony and before defendant was called to the stand, the assistant State's Attorney told the court that she believed that the State had met its initial burden of showing voluntariness with respect to defendant's allegations. At this juncture, the court asked defense counsel if there would be any other material witnesses that would need to be called. Defense counsel responded that, with regard to the slapping, which had occurred in the presence of the "two detectives that previously testified," there were no other material witnesses. Later, as defendant was testifying, the assistant State's Attorney referred to Carroll as "the one that testified a couple of days ago," a description confirmed by Jones. On November 26, in his closing argument on the motion, defense counsel referred to a statement which "Detective Carroll" made "under cross-examination." This statement related to Carroll's testimony about telling Jones, during the 2:30 p.m. interview, that the police "had evidence that [he] was the shooter in this case." Finally, in Jones' petition for severance,[1] filed January 3, 1986, and signed by the same attorney who questioned the witnesses and made the closing argument on behalf of Jones at

---

[1]At the time of the hearing on defendant's motion to suppress statements, this case was a joint proceeding against three codefendants: Charles Young, Earl Jones, and Stanley Rankins. Separate hearings were conducted on suppression motions of the individual defendants, who later received separate jury trials, from which Jones and Young filed separate appeals. Jones is the sole appellant in this case.

the suppression hearing, appeared the following statement: "Detectives Anthony Graffeo and Paul Carroll testified at the hearing on Petitioner's motion to suppress statements that Charles Young made oral statements to the effect that petitioner was actually the person who shot Robert Morrison."

The only objection regarding material witnesses which defense counsel raised before the trial court was to the State's failure to call Detective Carroll to rebut Jones' testimony about the verbal exchange at the 10:15 p.m. interview with Velcich, an alleged warning not to tell Velcich about the slapping which had occurred earlier in the presence of Carroll and Graffeo. The same objection is raised on appeal. While we agree that it would have been preferable for the trial court to have had the benefit of Carroll's rebuttal testimony on this matter, in addition to Velcich's, we do not regard its absence, in the light of other testimony and the totality of the circumstances, to constitute reversible error. The State met its burden of calling all material witnesses to the procuring of defendant's statements. The record shows that the trier of fact took defendant's testimony, as well as that of the State's witnesses, into consideration in deciding the merits of his claims, all of which were expressly alleged in his written motion prior to their testifying. Moreover, it is well settled that an appellant is responsible for providing a record which shows the errors claimed; where a record is incomplete, or is silent, a reviewing court will invoke the presumption that the trial court ruled or acted correctly. (*People v. Green* (1989), 179 Ill. App. 3d 1, 12, 535 N.E.2d 413, 420; *People v. Hamilton* (1978), 64 Ill. App. 3d 276, 278, 381 N.E.2d 74, 75.) Any doubt arising from the incompleteness of the record will be resolved against the appellant. (*People v. Fochs* (1976), 40 Ill. App. 3d 966, 967, 353 N.E.2d 326, 328; *People v. Zimmerman* (1965), 57 Ill. App. 2d 190, 192, 206 N.E.2d 741, 742.) Accordingly, we find no reason to reject the trial court's finding as to defendant's allegations of physical abuse.

The same principles apply to defendant's claims of being confronted with a misrepresentation about being the shooter and with a threat of being returned to his building where others could "kill him," and of being intercepted and warned by police after telling Velcich about the slapping. These allegations were stated with specificity in the written motion prior to the testimony of all material witnesses, as well as during the defendant's testimony. While they were factors to be considered in the court's overall determination of voluntariness, it was the province of the trial court to judge the credibility of the defendant and the other witnesses in discerning their truth.

The defendant also contends that he did not knowingly and intelligently waive his rights prior to giving his statements to police. He maintains that his age, limited intellect and confusion about his rights and whether he would be tried as a juvenile or adult precluded a knowing and intelligent waiver in the absence of counsel or a family member. For the following reasons, we agree with the trial court that the evidence presented does not support this contention.

The right to remain silent and to have counsel present during questioning can be waived, providing the waiver is voluntary, knowing, and intelligently made. (*Miranda v. Arizona* (1966), 384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602, 1628.) In demonstrating waiver, the burden rests on the prosecution to show a knowing and intelligent waiver of these rights. (*People v. Smith* (1982), 93 Ill. 2d 179, 185-86, 442 N.E.2d 1325, 1328.) The principle underlying the knowing waiver requirement has been stated by our supreme court as follows:

" 'The purpose of advising an accused of his rights is to enable him to make an intelligent decision, and to understand the consequences of that decision, and the fact that the advice was iterated and reiterated, and that he said he understood it, is of little consequence unless the defendant was possessed of the intelligence to understand the admonition.' " (*People v. Simmons* (1975), 60 Ill. 2d 173, 180, 326 N.E.2d 383, 386, quoting *People v. Turner* (1973), 56 Ill. 2d 201, 205, 306 N.E.2d 27, 30.)

The crucial test is whether the words, in the context used, considering the age, background and intelligence of the individual being questioned, impart a clear, understandable warning of all his rights. (*People v. Redmon* (1984), 127 Ill. App. 3d 342, 347, 468 N.E.2d 1310, 1314.) Furthermore, in examining the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused, special care should be exercised in evaluating the confessions of youthful or mentally deficient individuals. (*Redmon*, 127 Ill. App. 3d at 347, 468 N.E.2d at 1314.) However, it has also been held that when an individual has been admonished of his rights and indicates that he understands them, his giving of a statement without requesting a lawyer is evidence that he has chosen to waive a known right. (*People v. Martin* (1984), 102 Ill. 2d 412, 425, 466 N.E.2d 228, 234.) In reviewing the totality of circumstances, a preponderance of the evidence must demonstrate that the defendant understood and knowingly waived his rights. (*People v. Gore* (1983), 116 Ill. App. 3d 780, 784, 452 N.E.2d 583, 587.) Absent

an abuse of discretion, the trial court's finding on waiver will not be reversed unless it is contrary to the manifest weight of the evidence. *Gore*, 116 Ill. App. 3d at 784-85, 452 N.E.2d at 587.

■■■ It is undisputed the Detective Graffeo read defendant his *Miranda* rights at the 1:30 p.m. interview, before Jones gave any inculpatory statements to police. Graffeo testified that Jones acknowledged understanding each right as it was read from the police handbook, and stated for the record the exact words that were read to him. Yet defendant stated at the pretrial hearing that he only then, while testifying, understood the statement, "If you cannot afford or otherwise obtain a lawyer and you want one, a lawyer will be appointed for you and we will not ask any questions until he has been appointed." He acknowledged that he remembered Graffeo using those words at 1:30 p.m. on the date of his arrest, but said that he understood, at that time, only his right to remain silent. Graffeo testified that he again read these rights to defendant at the 2:30 p.m. interview, and that defendant stated that he understood them. While Jones denied hearing the rights at the second interview, he admitted that he never, at any meeting with the police or with the assistant State's Attorney, asked to have these rights further explained or stated that he was confused about their meaning. He also acknowledged that he never requested an attorney during his time in custody, and that his first request for notification or consultation with a parent or family member was at 8:30 p.m., seven hours after his arrival at the police station. The record further establishes that defendant spoke with his mother immediately after being readvised by Velcich of each *Miranda* right, and that Jones acknowledged understanding his right to remain silent and his right to have a lawyer present while he was being questioned, before he gave any statement, oral or written, to Velcich. The language which Velcich testified that he used at 8:30 p.m. in stating these rights, and which appears again in the court-reported statement, is complete and is no more difficult to understand than the questions which defendant answered during his pretrial and trial testimony.

Furthermore, while defendant may have had an approximate third-grade reading level at the time of his arrest, his testimony at the hearing, and later at his trial, belies any inference of inadequate or subnormal mental capacity. The trial court so found, and having reviewed the substantial record testimony by defendant, we agree. First, there is no evidence, such as an IQ score, tending to show subnormal intelligence, in the general sense. Furthermore, defendant's testimony was consistently logical and appropriate, evincing a thor-

ough understanding of the questions posed and the context of the court proceedings. Finally, it is undisputed that defendant, when arrested for this crime, had prior experience, on more than one occasion, with the juvenile court system, with an attorney, and with the juvenile division of the Department of Corrections. Considering the totality of the circumstances, we find no error in the court's conclusion that, by a preponderance of the evidence, defendant knowingly and intelligently waived his *Miranda* rights.

█ Lastly, we consider defendant's claim that he was confused as to whether he would be charged as a juvenile or an adult, and believed at the time of his court-reported statement that he would be prosecuted as a juvenile. Defendant does not dispute that Detective Graffeo told him, during his first police interview, that he would be charged "as an adult if you committed these crimes." We believe that it is reasonable to assume that Graffeo had prefaced this statement by enumerating some crimes, including murder. Jones also recalled that at the 2:30 p.m. interview, Graffeo told him that he would be charged as an adult if he were "charged with the crime." That crime could only have been the homicide which defendant and the detectives were discussing. Furthermore, youth officer Riordan testified that he told defendant that he would probably be charged "with murder as an adult." Finally, Velcich stated that at their first meeting, he enumerated the crimes, including murder, for which Jones could be prosecuted as an adult. Defendant also recalled that the police explained to him, in terms of a possible prison sentence, what it meant to be charged as an adult. While we note that a juvenile does not need to be specifically advised that he may be prosecuted as an adult in order for his confession to be judged voluntary (*People v. Prude* (1977), 66 Ill. 2d 470, 363 N.E.2d 371), in this case the evidence overwhelmingly supports the conclusion that defendant was so advised and gave his statements with an understanding of his potential criminal responsibility.

█ Taking into account the totality of the circumstances surrounding defendant's statements, the record discloses that, despite his youth and limited education, Jones had the mental capacity to understand the repeated *Miranda* warnings given to him, and which he acknowledged understanding in his transcribed statement and otherwise. He was legally detained by police for a total of 13 hours before signing his court-reported statement, during which he was interrogated for two very short periods of time over the seven-hour period before meeting with the assistant State's Attorney. During this period, he was given food, drink, and access to restroom facilities. He

was in apparently good health and not under the influence of alcohol or any drug. He spoke with a youth officer while in custody, and with his mother prior to giving the oral statement on which his written confession was based. Moreover, he was advised of the seriousness of his criminal liability and had prior experience with the criminal justice system. The trial court, taking into consideration defendant's controverted and uncorroborated allegations of being slapped twice and subjected to verbal coercion, and subjecting the circumstances surrounding his confession to special scrutiny, concluded that the State had met its burden of showing, by a preponderance of the evidence, that defendant's statement was voluntary. Because we find that this determination was not against the manifest weight of the evidence, it will not be disturbed.

### III

Defendant's final contention is that the State's evidence did not establish beyond a reasonable doubt that he was guilty of murder based on accountability. He argues that because the evidence did not show that he committed any overt act to assist Rankins and Young in the shooting, his conviction should be reversed.

Initially, we note that defendant is correct in stating that a person's mere presence at the crime scene or negative acquiescence in another's action is insufficient to establish accountability for the crime. (*People v. Nugara* (1968), 39 Ill. 2d 482, 487, 236 N.E.2d 693, 967; *People v. Watson* (1982), 106 Ill. App. 3d 315, 317, 436 N.E.2d 7, 8.) Section 5—2 (c) of the Criminal Code of 1961 provides in pertinent part:

> "A person is legally accountable for the conduct of another when:
> * * *
> (c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1983, ch. 38, par. 5—2 (c).)

In the case at bar, defendant's written statement to police manifested an agreement to aid Rankins and Young in the commission of a murder. The transcribed statement alone, even assuming, for the sake of argument, that the jury believed defendant's testimony that he did not suggest or freely consent to the addition of the words, "I say okay," clearly shows defendant's affirmative response to the question, "Before they left were you watching for the police?" A per-

son who agrees to, or actually does, function as a lookout for others, knowing that they intend to shoot a man as soon as he arrives on the scene, is either agreeing or attempting to aid the others in the commission of a crime, or both.

As to the element of intent, this court has stated that proof of a common purpose need not be supported by words of agreement but can be drawn from the circumstances surrounding the commission of an act by a group. (*People v. Gutierrez* (1985), 136 Ill. App. 3d 774, 781, 483 N.E.2d 944, 949.) Here, defendant's account of the incident, with or without any express agreement to aid the others, includes an admission which would allow a reasonable jury to conclude that he possessed the concurrent, specific intent to facilitate Robert Morrision's murder. Jones stated that, as Morrison climbed the stairway with his bicycle, and Rankins and Young ran around to the other stairwell to cut Morrison off at a higher level, he climbed the stairs behind the victim, walking slowly because he did not want Morrison to see him. This statement evinces a concurrent intent on defendant's part to facilitate the crime. Moreover, as this court has previously stated:

> " 'The requisite mental state for a crime may be proved by the acts and circumstances surrounding the defendant's conduct. *** The fact that the criminal acts were not committed pursuant to a preconceived plan is not a defense if the evidence indicates involvement on the part of the accused in the spontaneous acts of the group. [Citation.] If the proof shows that the accused was present at the scene of the crime and did not disapprove or oppose it, the trier of fact may competently consider that conduct in connection with other circumstances and thereby reach the conclusion that the accused assented to the commission of the criminal act, lent to it his countenance and approval and was thereby aiding and abetting the crime. [Citations.]' " (*People v. Washington* (1984), 127 Ill. App. 3d 365, 374, 468 N.E.2d 1285, 1292, quoting *People v. Porter* (1975), 28 Ill. App. 3d 411, 414, 328 N.E.2d 618, 621.)

Thus, the fact finder may infer a defendant's accountability from his approving presence at the scene of the crime and from evidence of conduct showing a design on defendant's part to aid in the offense. (*People v. Tinoco* (1989), 185 Ill. App. 3d 816, 823, 541 N.E.2d 1198, 1203.) Both factors are present here. Despite defendant's testimony that he intended to go straight home, that he was afraid of Rankins and Young, and that he "took off" and went up to his apartment as soon as the other gang members left his presence, the jury was free

to consider this testimony, and to judge its credibility, in light of defendant's actions as related in his written statement, his demeanor, and other relevant evidence, including his admission that he had been a member of the Disciples gang for two years at the time of the incident.

�manual Finally, there is no question that Jones, aware that Morrison had likely been shot, pursued, and shot again, took the opportunity to unstrap the food bags from the victim's bicycle, take the food upstairs to his apartment, warm it in a stove, and proceed to eat it. He did not, then or later, contact the police or report the crime to anyone. It is well settled that in determining whether accountability has been established, the trier of fact may consider a defendant's failure to report the incident or to confide in anyone about it. (*People v. Green* (1988), 179 Ill. App. 3d 1, 16, 535 N.E.2d 413, 422; *People v. Watson* (1982), 106 Ill. App. 3d 315, 317, 436 N.E.2d 7, 8; *People v. Lopez* (1979), 72 Ill. App. 3d 713, 716, 391 N.E.2d 105, 108.) We believe that all of the evidence, as set forth above, provided a sufficient basis for the jury to conclude that defendant was guilty of murder, under an accountability theory, beyond a reasonable doubt.

Based on the record before us, we hold that the trial court's denial of defendant's motions to quash arrest and suppress statements were not manifestly erroneous and must be upheld. Furthermore, the evidence presented at trial was sufficient to support a finding of guilt beyond a reasonable doubt. Accordingly, defendant's conviction is affirmed.

Affirmed.

LORENZ and MURRAY, JJ., concur.