THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NOLAN CHAMBERS, Defendant-Appellant.

First District (6th Division) No. 1—87—0110

Opinion filed June 22, 1990.

Randolph N. Stone, Public Defender, of Chicago (Edwin A. Burnette, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

A jury found defendant, Nolan Chambers, guilty of murder and attempted armed robbery. The court imposed an extended sentence of imprisonment for natural life without parole for murder, and 30 years' concurrent imprisonment for attempted armed robbery. On appeal, defendant contends that he was denied his right to cross-examination where certain mugbooks were not made available to him; that he was denied his right to a fair trial where the court would not permit him to elicit evidence concerning a now deceased victim's failure to identify him; that the court erred in failing to question one juror about his allegedly telling racial jokes to the courtroom staff after the verdict was given; that the court erred in denying his motion to quash arrest and suppress evidence; and that the sentence of natural life without parole is excessive.

On July 2, 1985, defendant and a second man were on a CTA bus. Defendant grabbed the purse of 80-year-old Caroline Snelling, who refused to let go. Sixty-four-year-old George Steele intervened and struggled with defendant. Defendant drew a gun and shot Steele in the chest, killing him.

Prior to trial, a hearing was held on defendant's motion to quash arrest and suppress evidence of the lineup identifications. The parties stipulated that on July 6, 1985, there was no arrest warrant against defendant and no crime was committed in the presence of police officers.

Officer Thomas Blomstrand testified at the hearing that on July 6, 1985, he and his partner, John Dahlberg, were assigned to work on the case. Blomstrand had been told by his sergeant that their office had been informed by a detective with the State Bureau of Narcotics that a confidential informant with whom he worked would meet an officer at a certain location and give information about the Steele murder. Blomstrand knew how many times the narcotics officer had used the informant.

Blomstrand and Dahlberg met the informant, who reported as follows:

"He said that, that there was a game room on Lawndale south of Chicago Avenue and that two men ran into that game room and one of the men had a gun and that this man's name was Nolan. The two men told the people who were in there, in the game room at the time, that they had just popped an old man on the bus. That the fellow he identified as Nolan then obtained a ride and took his gun and went out west to his lady's house."

The officers were aware that the game room was several blocks from the crime scene. The officers arranged to meet with the informant again in two hours, after he had obtained additional information.

Blomstrand and Dahlberg met the informant, who reported:

"He said that Nolan lived in a house on Trumbull I believe south of Chicago Avenue. He didn't know the exact address. He said that Nolan was excited and agitated and was hot to get out of the city and had been calling all over the place trying to get money together so he could leave."

Defendant had in fact telephoned the informant. The informant showed the officers his beeper, pressed the memory button, and defendant's telephone number became visible. The informant also said "that Nolan was dangerous and he said that he had a .357 revolver." The officers knew that the bullet recovered from Steele's body was of medium caliber which could be from a .357 revolver.

The officers were also aware that eyewitnesses had described the shooter generally as being a black male, around 20 years of age, 5 feet 10 inches to 6 feet tall, and weighing 150 to 170 pounds. The informant's description of defendant matched the eyewitnesses' descriptions.

The officers radioed for assistance and checked the telephone number, and in 30 minutes, they had discovered it was listed to a person named Edie Chambers at 634 North Trumbull, which was the street on which the informant had reported that defendant lived, and which was 1½ blocks from the murder scene.

In checking the name Nolan Chambers, the police officers discovered that a 20-year-old man with that name had previously reported living at the address 634 North Trumbull. In addition, he had a criminal history sheet showing several prior arrests and one year of supervision for purse snatching.

Four additional officers were assigned to assist Blomstrand and Dahlberg, and all of the officers drove to 634 North Trumbull. Several officers went to the back of the house. Blomstrand and Dahlberg met Mrs. Chambers at the front door. She said that defendant was not home. Defendant then walked into the room. He matched the description provided by the informant and the eyewitnesses and stated that his name was Nolan. He made no attempt to escape and was placed under arrest.

Officer Gregory Baiocchi testified at the hearing that on July 6, 1985, he and his partner, Dennis Keane, accompanied four officers to defendant's home. Baiocchi and Keane went into the backyard and saw defendant exiting the back door of the home. He was running down the stairs along a path on the side of the lot. The officers were directly in defendant's path. Defendant looked in their direction and ran back into the house. When the officers entered the house, defendant was in the living room, and he had been placed under arrest.

The court denied the motion to quash. The court found exigent circumstances and probable cause to arrest.

At trial, several eyewitnesses testified. Lavador Williams saw the incident from across the aisle and one seat behind Snelling. Williams viewed a lineup on July 6, 1985, and identified defendant. Gail Lofton saw the incident from the back seat of the bus, several seats behind the victims. On July 3, she looked at several mugbooks but did not see the man who shot Steele. She pointed to one picture which "looked like" defendant. On July 3, Lofton viewed a lineup which did not contain defendant, and she made no identification. On November 6, 1986, Lofton was shown a photograph of the July 6, 1985, lineup and she identified defendant.

Brenda Gaines was on the bus with her 11-year-old daughter, Todja. As defendant walked within one foot of her, Brenda saw a gun stuck in his pants. On July 3, 1985, Brenda and Todja separately viewed mugbooks, but did not identify anyone. On July 6, 1985,

Brenda and Todja separately viewed a lineup, and both of them identified defendant.

The witnesses described the incident similarly. At about noon on July 3, 1985, defendant and a second man entered the eastbound bus at St. Louis and Chicago Avenue, walked to the back, then turned to walk towards the front. Defendant stopped just before the rear door and tried to grab Snelling's purse. When Snelling resisted, defendant ordered her to let go of the purse. Steele, who sat several seats behind Snelling, intervened and grabbed defendant from behind. Defendant broke loose after a minute or two. He immediately drew a gun, turned and shot Steele in the chest. Steele's body fell against the rear stairs of the bus. Defendant jumped over the body and ran off the bus.

The parties stipulated that Caroline Snelling was 80 years old in July 1985, and that she died in September 1986 of natural causes.

Officer Patrick Foley testified that he and his partner conducted a lineup which did not include defendant. Snelling, Lofton, Brenda and Todja Gaines viewed the lineup and identified no one.

Blomstrand testified regarding defendant's arrest. On July 6, 1985, he conducted a lineup which included defendant. Williams, Brenda and Todja Gaines identified defendant.

Defendant testified that on the evening of July 2, 1985, he went to his girl friend's house. He left there at noon on July 3 and took an eastbound bus home, exiting at St. Louis and Chicago Avenue. He denied any participation in any crime on that day.

In rebuttal, Dahlberg testified that on July 6, 1985, he and Blomstrand interviewed defendant. At first, defendant stated that he had been at his girl friend's house, but then said he had been home alone all day. He then stated that he was at his home all day and that his girl friend had been with him.

After the jury found defendant guilty of attempted armed robbery and murder, defendant decided that the court, and not the jury, should determine whether to impose the death penalty. The court found that defendant qualified for the death penalty, but found that mitigating factors were present and that it would not impose the death penalty.

Defendant first contends that the court erred in denying his motion for a mistrial after Lofton testified that she viewed mugshots which contained a photograph of someone who "looked like" the shooter, but that the photograph was not of defendant. Defendant argues that the photograph was not made available to him, and thus, he was denied the right to cross-examine Lofton resulting in "incurable

detriment" to defendant.

The court initially directed the State to obtain the mugbooks, if possible. It was unknown whether defendant's photographs were in the books viewed by Lofton. The court conducted *voir dire* of Brenda and Todja Gaines, and determined that they had viewed mugbooks, but had not seen anyone who "looked like" the shooter. The court later stated, upon the State's inability to produce the unidentified mugbooks, that the motion for a mistrial was denied.

■ A violation of due process occurs when the State suppresses evidence material to the question of defendant's guilt or innocence after there has been a request for its production. (*Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.) To establish a violation of due process, however, defendant must show that the evidence was material. (*People v. Olinger* (1986), 112 Ill. 2d 324, 493 N.E.2d 579.) Evidence is material only if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. (*People v. Olinger*, 112 Ill. 2d 324, 493 N.E.2d 579; *People v. Bunch* (1987), 159 Ill. App. 3d 494, 512 N.E.2d 748.) It is not enough that the evidence might have helped the defense. *People v. Olinger*, 112 Ill. 2d 324, 493 N.E.2d 579; *People v. Bunch*, 159 Ill. App. 3d 494, 512 N.E.2d 748; *People v. Rios* (1986), 145 Ill. App. 3d 571, 495 N.E.2d 1103.

If the books contained a photograph of defendant, he might have used them to attempt to show the failure to identify by Lofton, and by Brenda and Todja Gaines. Defendant might also have tried to use the photograph Lofton said "looked like" defendant to show that it did not resemble him. Such attempts would carry little weight in light of the witnesses' positive identifications of defendant at trial and in a lineup. Williams' testimony also corroborated the lineup identifications, and she was shown no mugbooks.

■ We cannot say that, even if the evidence "might have helped" defendant in some vague, speculative way, it was material. It would not have altered the outcome of the trial.

Defendant next contends that he was denied a fair trial when the court denied his attempt to elicit testimony from Blomstrand that the now deceased Snelling failed to identify defendant in a lineup.

On cross-examination, defense counsel asked Blomstrand about a lineup which Snelling viewed:

"DEFENSE COUNSEL: How many people did you bring in for an identification?

\* \* \*

BLOMSTRAND: Five people.

DEFENSE COUNSEL: Who were they?

BLOMSTRAND: Brenda and Todja Gaines, LaVador Williams, Caroline Snelling, and Stanley Davis.

DEFENSE COUNSEL: How many—by the way, Miss Snelling never identified—.

PROSECUTOR [Epach]: Objection.

SECOND PROSECUTOR [Crown]: Objection.

THE COURT: Sustained.

PROSECUTOR [Epach]: Ask the jury to disregard, *not true.*" (Emphasis added.)

At a subsequent sidebar, defense counsel argued that "Mr. Epach lied to the jury by saying [']not true['] as to Caroline Snelling. Caroline Snelling did not make an identification of the defendant, at that particular time."

We agree with the trial court that it "start[ed] out with an incorrect, improper question" by defense counsel. There is no question that Snelling's identification or nonidentification statement to the police would be hearsay and would be properly excluded because she could not be cross-examined. See *People v. Rogers* (1980), 81 Ill. 2d 571, 411 N.E.2d 223; *People v. McNeal* (1987), 160 Ill. App. 3d 796, 513 N.E.2d 897.

■ Furthermore, the court twice instructed the jury to "disregard any comments by any counsel as to whether or not there were or were not, in fact, any identifications by Mrs. Snelling. *** Please don't conjecture on that point ***." Thus, any error in the prosecutor's statement, "not true," was harmless. See *People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200; *People v. Whitfield* (1986), 140 Ill. App. 3d 433, 488 N.E.2d 1087.

Defendant next contends that the court erred in failing to *voir dire* jury foreman Donald Harenberg and investigate the allegation that he told a racially degrading joke to the courtroom staff.

Defendant's post-trial motion alleged that Harenberg made racial comments to the courtroom staff. This occurred following the verdict, when the jury was held over while defendant decided whether the court or the jury should decide whether to impose the death penalty. The pertinent portion of the post-trial motion reads:

"A juror was heard to made [*sic*] what would be considered and interpreted to be racial comments to the court room staff.

a) The defense counsel only learned of this the day after the verdict was taken.

b) Such comments must be considered in direct contradiction to answers he gave in questioning during voir dire."

■ A defendant bears the burden of proof when he challenges the prejudice of a juror. He must show the juror was actually prejudiced and that there was a reasonable apprehension that defendant could not receive a fair trial. *People v. Porter* (1986), 111 Ill. 2d 386, 489 N.E.2d 1329; *People v. Hunt* (1983), 112 Ill. App. 3d 138, 445 N.E.2d 408.

Defendant has failed to meet that burden. He did not present the testimony of the probation officer who allegedly overheard the joke; he did not submit the officer's affidavit, although defense counsel suggested such an affidavit would be filed in order to save the probation officer the embarrassment of testifying; and counsel's "offer of proof" did not relay the details of the overheard comments, although the court asked for the details.

■ Defendant's bare allegations of prejudice, based on an inappropriate joke told *following* the entry of the verdict, are insufficient to prove the juror's prejudice or establish that defendant received an unfair trial.

Defendant also contends that the court erred in denying his motion to quash arrest and suppress evidence.

■ In ruling on a motion to quash arrest and suppress evidence, the trial court must determine the credibility of the witnesses and the weight to be given their testimony. Its finding of probable cause will not be disturbed unless it is manifestly erroneous. *People v. Stoica* (1987), 163 Ill. App. 3d 660, 516 N.E.2d 909; *People v. Mitchell* (1984), 123 Ill. App. 3d 868, 463 N.E.2d 864.

■ The reasonableness of police officers' conduct in making an arrest without a warrant must be judged on the basis of their responsibility to prevent crime and to catch criminals, and to act quickly in appraising data, and that conduct is to be judged by practical considerations of everyday life. (*People v. Stachelek* (1986), 145 Ill. App. 3d 391, 495 N.E.2d 984.) Probable cause for purposes of arrest is judged by whether the facts and circumstances known to the police would cause a person of reasonable caution to believe that the person arrested committed the offense in question. *People v. Montgomery* (1986), 112 Ill. 2d 517, 494 N.E.2d 475; *People v. Hattery* (1989), 183 Ill. App. 3d 785, 539 N.E.2d 368.

Defendant argues that the exigency of the situation was not relevant because the exigency was "inherent only in the informant's story."

■ Factors of particular significance in assessing the presence of exigent circumstances and the reasonableness of a warrantless arrest include whether the time period between the commission of the crime

and arrest creates a need for prompt action; whether the police deliberately and unjustifiably delayed acting, during which time a warrant could have been obtained; whether the suspect was armed or exhibited signs of a violent nature; whether the officers were acting on a clear showing of probable cause; and whether defendant was clearly identified as the offender. *People v. Grant* (1982), 104 Ill. App. 3d 551, 432 N.E.2d 1200.

In finding probable cause to arrest, the trial court could properly consider that the officers acted with reasonable speed and did not delay acting where they arrested defendant within an hour after they obtained identification evidence. (See *People v. Carmack* (1982), 103 Ill. App. 3d 1027, 432 N.E.2d 282.) At 7 p.m., the informant reported to the police officers defendant's telephone number. By 7:30 p.m., the officers had obtained the address, verified that a man named Nolan Chambers had used the address, and obtained his criminal record. The officers immediately went to defendant's home.

The police also knew that defendant intended to leave town as soon as possible, and that three days had already passed since the murder occurred. See *People v. Sprovieri* (1969), 43 Ill. 2d 223, 252 N.E.2d 531.

The trial court also properly considered the fact that the officers were dealing with murder. If a serious and violent offense has been committed, the police are more likely to be justified in immediately apprehending the suspect without a warrant. *People v. Stachelek*, 145 Ill. App. 3d 391, 495 N.E.2d 984; *People v. Cobb* (1983), 97 Ill. 2d 465, 455 N.E.2d 31; *People v. Columbo* (1983), 118 Ill. App. 3d 882, 455 N.E.2d 733.

The trial court also properly considered the fact that the murder weapon had not been recovered, that the informant had seen defendant with the gun just after the shooting, and that he had warned the officers that defendant was armed and dangerous. An in-home warrantless arrest will be justified particularly if a suspect of a serious and violent crime is reasonably likely to be armed. *People v. Cobb*, 97 Ill. 2d 465, 455 N.E.2d 31; *People v. Columbo*, 118 Ill. App. 3d 882, 455 N.E.2d 733.

The police could rely on the fact that defendant matched the informant's and eyewitnesses' descriptions of the shooter. (See *People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280.) The police could also consider the proximity between defendant's home and the scene of the crime. (See *People v. Stachelek*, 145 Ill. App. 3d 391, 495 N.E.2d 984.) The police further knew that a man named "Nolan" had admitted to the informant shortly after the shooting, and within a few blocks of

the shooting, that he had "popped an old man" on the bus, and showed the informant the gun. See *People v. Padilla* (1979), 70 Ill. App. 3d 406, 387 N.E.2d 985.

Defendant argues further that there was no probable cause where the basis for the arrest was "the unverified story of a classified informant whose reliability and background [were] unestablished."

■ An arresting officer may rely upon information supplied by an informant if the reliability of the informant has been established or independently corroborated. (*People v. Tisler* (1984), 103 Ill. 2d 226, 469 N.E.2d 147; *People v. Jones* (1988), 169 Ill. App. 3d 883, 524 N.E.2d 593.) Corroborated details of an informant's tip go to support his veracity and reliability. (*People v. Beck* (1988), 167 Ill. App. 3d 412, 521 N.E.2d 269.) If there is no indication that the informant was paid by the police, it is presumed he is an ordinary citizen whose information is presumed to be reliable. *People v. Hall* (1987), 164 Ill. App. 3d 770, 518 N.E.2d 275.

In addition to the presumption of reliability, the informant's statements here were corroborated by the eyewitness descriptions of defendant. (See *People v. Pierson* (1988), 166 Ill. App. 3d 558, 519 N.E.2d 1185.) Furthermore, the informant showed the officers the telephone number of defendant on his beeper. The number matched an address which was close to the murder scene and matched an address given by a man with the name Nolan Chambers, who previously had been placed on supervision for purse snatching. See *People v. Bean* (1979), 73 Ill. App. 3d 918, 392 N.E.2d 650, *aff'd* (1981), 84 Ill. 2d 64, 417 N.E.2d 608.

The informant's detailed description of the shooting also corroborated his information. (See *People v. Borges* (1980), 88 Ill. App. 3d 912, 410 N.E.2d 1076.) The informant knew the caliber of the weapon, that the victim was an older man, and the fact that the shooting occurred on a bus.

■ We conclude that the arrest was justified by compelling evidence that defendant was implicated in the murder. (See *People v. Columbo*, 118 Ill. App. 3d 882, 455 N.E.2d 733.) The trial court's finding that the officers had probable cause to make a warrantless arrest under exigent circumstances is not manifestly erroneous. The court properly denied defendant's motion to quash arrest and suppress evidence.

Defendant finally contends that a sentence of natural life without parole is disproportionately severe. He argues that "it is in some ways the functional equivalent of the death penalty." Defendant relies on the dissent in *People v. Young* (1987), 152 Ill. App. 3d 361, 369,

504 N.E.2d 115, 120-21. (Justice Quinlan dissenting.) Our supreme court, however, affirmed the majority opinion. *People v. Young* (1988), 124 Ill. 2d 147, 529 N.E.2d 497.

 A sentence is within the discretion of the trial court, and that sentence will not be disturbed absent an abuse of discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The court here decided that defendant qualified for the death penalty, but found that his age and lack of criminal background were sufficient mitigating factors to prevent its imposition of the death penalty. The court, however, focused on the senseless, brutal nature of the killing by a man who "thought that he could get a couple easy dollars from an 80-year-old woman, and he was prevented from doing so by George Steele, aged 64, who was in fact literally and figuratively a hero of our times." The court properly considered the nature and seriousness of the offense committed.

 Defendant maintains that there was "no evidence to support the proposition that rehabilitation of [defendant] is not possible." The court is not required to find defendant has no rehabilitative potential before sentencing him to a term of natural life imprisonment. (*People v. Young* (1988), 124 Ill. 2d 147, 529 N.E.2d 497.) Moreover, the court here considered defendant's rehabilitative potential, including the pre-sentencing investigation report, testimony from defendant's mother, defendant's age, and his lack of criminal history. The court was permitted to reject this evidence in light of the type of crime committed by defendant. (See *People v. Young*, 124 Ill. 2d 147, 529 N.E.2d 497.) We find no abuse of discretion, and we will not disturb the sentence imposed on defendant by the trial court.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

LaPORTA, P.J., and RAKOWSKI, J., concur.