THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD SEVIER *et al.*, Defendants-Appellants.

First District (6th Division)   No. 1—86—3109

Opinion filed June 26, 1992.

1072

Rita A. Fry, Public Defender, of Chicago (Evelyn G. Baniewicz, Assistant Public Defender, of counsel), for appellants.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Barbara Jones, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

This appeal arises from three consolidated cases. Following a joint jury trial, defendants Edward Sevier and Sylterrell Brown were each found guilty of murder and attempted armed robbery. Sevier was sentenced to concurrent terms of 30 years' imprisonment for murder and 15 years for attempted armed robbery. Brown was sentenced to concurrent terms of 35 years for murder, 25 years for attempted armed robbery, and 15 years for armed violence. (Codefendant Keith Bond was convicted of murder and attempted armed robbery in the same joint jury trial; however, we address the issues raised in Bond's appeal in a separate opinion filed on this date, *People v. Bond* (1992), 230 Ill. App. 3d 1086.)

On appeal, defendants contend that the following matters constitute reversible error: (1) the admission of codefendant Bond's unredacted statements through the testimony of the State's witnesses denied defendants their sixth amendment right to confront witnesses against them; (2) the court erred in denying defendants' motions for mistrial and severance based upon the confrontation clause and prejudice resulting from the antagonistic defense advanced by Bond; (3) the court should have granted defendants' motions to quash arrest and suppress evidence; (4) absence of probable cause to arrest defendants; (5) the court erred in denying Brown's motion to suppress statements; (6) the State exercised its peremptory challenges in a racially discriminatory manner; (7) Sevier's convictions for murder and attempted armed robbery are inconsistent with the jury's verdict of not guilty on the offense of armed violence; (8) whether Brown's conviction for armed violence must be vacated because it constitutes an impermissible double enhancement of the underlying offense of attempted armed robbery; (9) defendants were not proved guilty of attempted armed robbery; and (10) the sentences imposed were excessive.

In the early morning hours of December 24, 1984, William Young, age 56, received a gunshot wound to his head at 71st Street and Ridgeland Avenue in Chicago. A small, single-shot pistol was found underneath the deceased's body. The deceased died as a result of the injuries sustained from the gunshot wound on January 3, 1985.

On that morning, Ronald Boston was operating a newsstand at the corner. At 6 a.m., Boston sold a newspaper to a man who began walking westbound on 71st Street. Moments later, two men approached the newsstand and bought a newspaper. The men then continued walking west on 71st in the same direction that the first man had walked. Approximately 10 to 15 seconds later Boston heard the report of two gunshots. Boston left the newsstand and saw a man lying in the street whom he recognized as the man to whom he had just sold a newspaper. Boston did not see who fired the shots. Boston viewed a lineup in February 1985, but was unable to identify any of the defendants. Boston stated that he saw only two men approach the newsstand and that he did not see a third man on the street.

MOTION TO QUASH ARREST AND SUPPRESS EVIDENCE

The defendants filed pretrial motions to quash arrest and suppress evidence. Sevier, age 17 at the time of the offense, testified that on February 18, 1985, he was living with his mother, stepfather, and two brothers. That evening the police knocked at his apartment door. Sevier attempted to open the door; however, the police kicked it open. Sevier's mother was directly behind him. Two police officers, together with Adolph Powell, entered the apartment and asked his name. After Sevier responded, Powell said "that's him." The detectives indicated that they wanted to take him to the police station to question him about a robbery. Sevier stated that he did not want to go to the police station and that they could question him at home. The police told Sevier to get dressed, handcuffed him, and took him to the police station. The police did not indicate to Sevier whether they had a warrant for his arrest, nor did they produce a search warrant. Sevier stated that neither his mother nor brother opened the door to allow the police inside the apartment.

Brown, age 16 at the time of the murder, testified that on the morning of February 19, 1985, he was lying in bed in the home he shared with his mother and stepfather. According to Brown, the police "busted through my room, grabbed me up out of the bed and told me I was under arrest." The police asked Brown to get dressed and handcuffed him. Brown was then taken to the police station.

Chicago police officer Al Grefsheim testified on behalf of the State that on February 18, 1985, at approximately 9:55 p.m., he proceeded to Sevier's apartment accompanied by another detective and Powell. Powell had been picked up by the police earlier that evening because he fit the description of one of the suspects sought in connection with this murder. Grefsheim brought Powell for the purpose of

identifying an individual whom he referred to as "Pookie." According to Powell, Pookie had told him that he, together with Bond and Brown, approached the deceased after he bought a paper at the newsstand. After the deceased made a movement toward his waist, one of them shot him.

Upon arriving at Sevier's apartment, Grefsheim observed two men and a woman outside the door. After he knocked on the door, the individuals asked Grefsheim what he wanted, to which he replied that he was looking for Edward Sevier. The man knocked on the door and entered the apartment. A woman, later identified as Pookie's mother, came to the door. She indicated that Pookie was home and invited the detectives into the apartment. When the detectives entered the apartment, they did not have their guns drawn. Powell identified Sevier as the person he knew as Pookie. Grefsheim told Sevier to get dressed and took him to the police station for questioning in the robbery-murder investigation.

Under cross-examination, Grefsheim stated that he did not attempt to obtain a search warrant or an arrest warrant for Sevier. Grefsheim did not kick open the door or handcuff Sevier. Neither Sevier nor his mother objected to accompanying Grefsheim to the police station.

Officer Brian Regan corroborated Grefsheim's account of the events and stated that they never kicked or forced open the door to either Sevier's or Brown's apartment. During cross-examination, Regan stated that they did not try to obtain an arrest warrant for Brown because they were in the course of conducting their investigation.

Sevier's stepfather, Reginald Collier, testified that he did not give the police officers permission to enter his apartment and arrest Sevier, nor did he extend permission for them to conduct a search of the apartment. Collier specifically asked the officers whether they had a warrant, but the officers replied that they did not need one. Under cross-examination, Collier stated that neither he nor Sevier's mother answered the door, and that he did not know whether Sevier's brother opened the door for the police.

Gayle Matthews, Sevier's mother, testified that on the evening of Sevier's arrest, she was at home with Collier. Shortly before 10 p.m., she looked up and saw two plainclothes police detectives enter the apartment. The police asked Sevier his name and then directed him to get dressed. After Sevier finished dressing, the police handcuffed him. Matthews did not give the police permission to enter her apartment or arrest Sevier.

Dorothy Adams, Brown's mother, testified that at approximately 8 a.m. on February 19, 1985, she was in bed when she heard a knock on her apartment door. Adams went to the door and saw two men. The men did not identify themselves as police officers. The men asked whether Brown was at home. After Adams responded affirmatively, the men entered the apartment. They then entered Brown's bedroom and pulled him out of bed. After Brown was dressed, the police handcuffed him. When Adams began crying, the police showed her some identification and told her they were taking Brown to the police station. The police did not show Adams a warrant for the arrest of her son or a search warrant for her house. Adams did not at anytime extend permission for the officers to enter her apartment.

Under cross-examination, Adams stated that Brown had been the victim of a shooting two weeks prior to his arrest. Adams denied asking the police whether they were investigating that shooting incident. Adams' husband testified similarly concerning the circumstances of Brown's arrest.

In rebuttal, Officer Markham testified that he accompanied Grefsheim and Powell when they went to Sevier's apartment. Markham testified that Sevier's mother opened the apartment door and invited the officers inside the apartment. Sevier was not handcuffed and went voluntarily with the police. Officer Steve Glyn testified that Brown's mother admitted them into the apartment and asked whether they wanted to speak with him about his shooting.

At the conclusion of the hearing, the trial court denied defendants' motion to quash arrest and suppress evidence.

THE TRIAL

Glyn testified that he advised Sevier of his *Miranda* rights. Sevier gave Glyn an oral statement stating that he was with two men named "Keith" and "Terrell" on 71st Street, and they discussed robbing an old man. As the three men approached the deceased and attempted to rob him, the deceased reached inside his coat. Sevier and Bond fled the scene while Brown, who carried a gun, continued to speak with the deceased. Sevier heard several shots. The three defendants then ran to Brown's house. Sevier agreed to help the police locate the other defendants' residences, as he only knew them by their first names.

Glyn testified that he advised Bond of his constitutional rights. Bond informed Glyn that he was on 71st Street with Sevier, whom he knew by the nickname of "Pookie" when they met Brown. Sevier and Brown began discussing the robbery of an old man. They saw the de-

ceased walk away from a newsstand. Glyn testified further that Bond told him Brown began following the deceased, while Bond and Sevier crossed the street towards him. The three men approached the deceased, who went inside his coat as if he had something. As they started to run, Bond heard several shots. They ran back to Brown's house, where they met after fleeing the scene. Glyn also testified that Bond informed him Brown carried the gun and was the shooter.

In Brown's initial statement to Glyn, he denied any involvement in the shooting of the deceased. In a subsequent statement, Brown stated that Sevier and Bond came to his house and that they wanted to go out and make some money by robbing people. Brown stated that Sevier was armed with a handgun. The three men began walking behind the deceased, and Brown acted as lookout by walking in the street. Sevier and Bond approached the deceased, who turned around and pushed them off. After the deceased appeared to pull something from his waistband, all three defendants fled. In a third statement given to the assistant State's Attorney, Brown admitted firing once at the deceased, but also stated that he heard two more gunshots.

None of the defendants were identified by Ronald Boston or James Reed, a witness who arrived on the scene shortly after the shooting. The murder weapon was never recovered.

At the close of the State's case in chief, the trial court denied each defendant's motion for a directed verdict. Sevier also made a motion for a mistrial based upon the admission of the oral and written statements of the other codefendants which implicated him in the offense. Alternatively, Sevier contended that a separate trier of fact should have been impaneled to hear his cause. Brown made a similar motion for a mistrial, maintaining that the statements admitted by the State were not of an interlocking nature. The court denied Sevier's and Brown's motions for a mistrial.

Sevier testified that on the evening of December 23, 1984, he was at Brown's house with Bond and three other boys, and that they were smoking marijuana and shooting dice. After the dice game ended, Sevier, Brown and Bond decided to buy some marijuana from a neighborhood gang drug house called the "Yellow Building" located at 70th and East End. Thereafter, they walked over to a newsstand, where Brown brought a newspaper. Sevier, Bond and Brown approached the deceased, who pulled out a gun. As they began running, Adolph Powell emerged from an alley and fired two shots at the deceased.

Sevier had known Powell, who was the leader of the Black Gangster Disciples street gang, for approximately eight years. Following the shooting, Sevier did not see Powell until early February 1985. Se-

vier recanted the statements he gave the police following the murder in which he named Brown as the shooter. He stated that he did not tell the truth because Powell threatened to harm him and his family. Under cross-examination, Sevier admitted that he did not see Powell shoot at anybody and that he had not told the assistant State's Attorney that Powell was responsible for the murder of the deceased.

Brown testified that as he approached the deceased, he couldn't focus or see a gun, yet he was aware that the deceased directed a gun toward them. After Brown, Sevier and Bond began running along the railroad tracks, Brown heard a gunshot and saw Powell coming out of the alley. Subsequently, Brown heard two more gunshots. Brown denied owning a gun or carrying one on the morning of the murder.

Brown next saw Powell on February 14, 1985, at his home. Powell asked Brown if he or one of the codefendants shot the deceased. Powell then aimed a pistol toward his head. When Brown attempted to move the gun, Powell shot him in the hand. Like Sevier, Brown denied the veracity of the statements given to the State's Attorney following his arrest.

Both Brown and Sevier testified that the police threatened and coerced them into giving statements. Specifically, Sevier testified that the police threatened to break his nose and inflict other physical harm if he did not provide a statement. Brown testified that the police continually struck him during the time he was in custody by grabbing his neck, banging his head against the wall, and pressing on the area of his hand where he had received stitches from the gunshot wound.

During rebuttal, Officers Regan, Glyn and Markham denied threatening or physically harming any of the codefendants during the time they were in custody.

The jury found all defendants guilty of murder and attempted armed robbery. In addition, Brown was found guilty of armed violence.

On appeal, defendants first contend that the admission of Bond's unredacted statements through the testimony of the State's witnesses denied Brown and Sevier their sixth amendment right to confront witnesses against them.

Prior to trial, the judge denied Brown's motion for severance. At that time, Brown argued that this cause required severance because it presented confrontation clause issues pursuant to *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620. In *Bruton*, the Supreme Court held that a defendant is deprived of his rights under the confrontation clause of the sixth amendment when his codefendant's incriminating confession is introduced at their joint

trial, even if the jury is instructed to consider that confession only against the codefendant. This so called *"Bruton"* conflict may be resolved by granting a severance before trial, or by redacting the codefendant's statements which are published to the jury to omit any reference to the defendant. *People v. Lincoln* (1987), 157 Ill. App. 3d 700, 510 N.E.2d 1026.

More recently, in *Cruz v. New York* (1987), 481 U.S. 186, 95 L. Ed. 2d 162, 107 S. Ct. 1714, the Supreme Court held that where a nontestifying codefendant's confession facially incriminating the defendant is not directly admissible against the defendant, the confrontation clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him. As succinctly expressed by the *Cruz* court:

"A codefendant's confession will be relatively harmless if the incriminating story it tells is different from that which the defendant himself is alleged to have told, but enormously damaging if it confirms, in all essential respects, the defendant's alleged confession. It might be otherwise if the defendant were *standing by* his confession, in which case it could be said that the codefendant's confession does no more than support the defendant's very own case. But in the real world of criminal litigation, the defendant is seeking to *avoid* his confession—on the ground that it was not actually reported, or that it was not really true when made." (Emphasis in original.) *Cruz v. New York* (1987), 481 U.S. 186, 192, 95 L. Ed. 2d 162, 171, 107 S. Ct. 1714, 1718-19.

In the present case, Sevier and Brown both recanted the statements which implicated Brown as the shooter, and instead stated that Powell was responsible for the murder of the deceased. Sevier testified that the reason he initially named Brown as the shooter was because he had an established friendship with Bond, and that they agreed to name Brown as the shooter. Also, Powell had threatened to harm Sevier and his family if he did not confess that Brown was the shooter. A codefendant's statement must be considered presumptively unreliable when it interlocks with the defendant's own statement, which he seeks to deny the truth of at their joint trial. *People v. Lincoln*, 157 Ill. App. 3d 700, 510 N.E.2d 1026.

We first note that prior to trial, Bond filed a motion to suppress statements, in which he contended that he was forced by the detectives into signing the statements presently at issue. Glyn testified that Bond told him that he met Brown and that Sevier and Brown

started discussing the robbery. In his second statement, Bond told the police that Brown had a gun, that Brown told Bond that that he fired two shots at the deceased, and that Brown thought he had hit him. Bond's written confession was also given to the jury for its examination.

In total, there were 11 statements made by Bond, Sevier and Brown in connection with this murder following their arrests. The judge periodically admonished the jury throughout the trial that "the statements that the witness has testified to of any one defendant can only be considered as far as that defendant is concerned." Under certain circumstances, it is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information. However, there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.

The State relies upon *Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056, which holds that the confrontation clause is not violated by introduction against a defendant of an unavailable codefendant's confession with guarantees of trustworthiness equivalent to those of evidence falling within traditional hearsay exceptions. The State argues that the confession of all three codefendants interlock except for certain irrelevant and trivial details, and that Bond's confession was voluntary. The State further urges that other independent evidence corroborates Bond's statement, such as the other defendants' confessions, Boston's testimony, and that the deceased was found with a small pistol underneath his body. As such, Bond's confession meets the *Lee* requirements for admission.

We are unpersuaded by the State's position that all three defendants' statements interlock, and that independent evidence exists that provides a sufficient "indicia of reliability" for the admission of Bond's statement. Disparities existed among the statements with respect to who was carrying a gun and the number of shots fired. In addition, there were no eyewitnesses who positively identified either Brown or Sevier, nor was a gun recovered or any other physical evidence connecting any of the defendants to the deceased. Boston was unable to pick any of the defendants at a lineup.

Accordingly, we find that the effect of the admission of Bond's statements through the State's witnesses, as well as through his written statements, was so devastating to Brown's and Sevier's defense

that it effectively deprived them of their constitutional right to a fair trial. Bond's statements, especially from Brown's perspective, were extremely prejudicial. Brown and Sevier were never afforded the opportunity to challenge the credibility of Bond's statements and subject them to cross-examination. In contrast to situations where accomplices do take the stand and the jury is instructed to weigh their testimony carefully, given the recognized motivation to shift blame to others, the reliability of evidence taken when alleged accomplices do not testify and cannot be tested by cross-examination violates the principles established by the sixth amendment through the confrontation clause. (*Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.) We therefore reverse defendants' convictions and remand for a new trial, separate from Bond.

■ Defendants next assert that, in addition to the confrontation clause issue discussed above, the trial court erred in denying defendants' motions for mistrial and severance based upon the antagonistic defense advanced by Bond. We find, however, that this issue is subsumed within our conclusion that both defendants' rights pursuant to the confrontation clause were indeed violated. Our remand for a new trial separate and apart from Bond will effectively cure any antagonistic defense issues.

Although we have remanded this cause, defendants raise several other issues which we must address at this time. Issues on which we do not comment are unlikely to recur at the new trial.

Defendants contend that the trial court erred in denying the motions to quash arrest and suppress evidence where the State failed to prove either valid consent to enter Brown's or Sevier's home, or that exigent circumstances existed to justify its warrantless entry into defendants' homes. Defendants cite *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, for the proposition that the police may not, absent exigent circumstances, enter a "suspect's home" to arrest the suspect without a warrant for the suspect's arrest and reason to believe the suspect is within. Defendants further argue that the State cannot establish attenuation between the unlawful detention and defendants' incriminating statements.

It is well established that voluntary consent to entry will justify a warrantless at-home arrest even in the absence of exigent circumstances. (*People v. White* (1987), 117 Ill. 2d 194, 512 N.E.2d 677; *People v. Bean* (1981), 84 Ill. 2d 64, 417 N.E.2d 608.) Moreover, such consent need not be given by the defendant; it may instead be obtained from a third party. (*People v. Bean*, 84 Ill. 2d 64, 417 N.E.2d 608; see also *United States v. Matlock* (1974), 415 U.S. 164, 39 L. Ed. 2d 242,

94 S. Ct. 988; *People v. Heflin* (1978), 71 Ill. 2d 525, 376 N.E.2d 1367.) The State has the burden of proving that the consent given was truly voluntary, and the voluntariness of that consent is a question of fact to be determined from consideration of the totality of circumstances in a particular case. *People v. White*, 117 Ill. 2d 194, 512 N.E.2d 677; *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041.

■ In the present case, the trial judge heard Sevier's testimony that the police kicked the door open and Brown's account that the police "busted through my door, grabbed me up out of the bed and told me I was under arrest." Similarly, Sevier's mother and stepfather and Brown's mother also testified concerning the circumstances of the arrest which we have previously set forth at length. Conversely, Grefsheim testified for the State that Sevier's mother invited the police officers into the apartment. In rebuttal, Glyn testified that Brown's mother admitted them into the apartment and asked whether they wanted to speak with him about the gunshot wound to Brown's hand which he had recently sustained.

In ruling on a motion to quash arrest and suppress evidence, the trial court must determine the credibility of the witnesses and the weight to be given their testimony. (*People v. Chambers* (1990), 200 Ill. App. 3d 538, 558 N.E.2d 274.) The decision of a trial court on a motion to quash and suppress will not be disturbed by a reviewing court unless that finding is determined to be clearly erroneous. (*People v. Foskey* (1990), 136 Ill. 2d 66, 554 N.E.2d 192.) Upon close scrutiny of the record, we find that sufficient evidence exists to demonstrate that defendants' mothers voluntarily consented to the police entry. Consequently, defendants' contention that the State did not establish attenuation fails in light of our holding that defendants were not illegally arrested.

Defendants also maintain that the State failed to prove that the police officers had probable cause to arrest defendants. Defendants contend that the State made no effort to show that Powell, who was previously considered as a suspect in the murder of the deceased, was credible or that his information was reliable. Further, Powell's statement that "Pookie" had told him that he and two others approached the deceased after he had bought a newspaper from the newsstand operated by Boston is uncorroborated by other evidence. Finally, defendants argue that although the judge found that "the police did not have sufficient evidence to obtain a warrant," the trial court nonetheless denied the motion to quash arrest.

Probable cause for purposes of arrest is judged by whether the facts and circumstances known to the police would cause a person of reasonable caution to believe that the person arrested committed the offense in question. (*People v. Chambers* (1990), 200 Ill. App. 3d 538, 558 N.E.2d 274.) The reasonableness of police officers' conduct in making an arrest without a warrant must be judged on the basis of their responsibility to prevent crime and to catch criminals, and to act quickly in appraising data, and that conduct is to be judged by practical considerations of everyday life. (*People v. Chambers*, 200 Ill. App. 3d 538, 558 N.E.2d 274, citing *People v. Stachelek* (1986), 145 Ill. App. 3d 391, 495 N.E.2d 984.) Although mere suspicion is insufficient to establish probable cause for an arrest, probable cause may be founded upon evidence which would not be admissible at trial and which need not be sufficient to establish guilt beyond a reasonable doubt. (*People v. Jones* (1990), 196 Ill. App. 3d 937, 554 N.E.2d 516.) A reviewing court will not disturb a trial court's ruling on a motion to quash an arrest for lack of probable cause unless it is manifestly erroneous. *People v. Jones*, 196 Ill. App. 3d 937, 554 N.E.2d 516; *People v. Stachelek*, 145 Ill. App. 3d 391, 495 N.E.2d 984.

In the present case, the facts and circumstances known by Grefsheim at the time he arrested Sevier are determinative of whether probable cause existed. After Powell informed him that "Pookie" and two others were involved in the murder, Grefsheim drove to Sevier's apartment, where he was arrested. Thereafter, Sevier named Brown and Bond in connection with the murder. Sevier's implication that Brown was the shooter in the murder of the deceased can rightfully be considered as a statement against penal interest. Our supreme court has concluded that such statements, by their very nature, may possess inherent indicia of reliability. (*People v. James* (1987), 118 Ill. 2d 214, 514 N.E.2d 998.) Boston's testimony that the deceased was the man to whom he had recently sold a newspaper also provides support for Powell's account that Sevier was in fact involved in the murder. Accordingly, we find that probable cause existed to support defendants' arrest.

Brown alone contends that the trial court erred in denying his motion to suppress statements made subsequent to his arrest, contending that those statements were not voluntary. Brown contends that his age, injured physical condition, isolation from his family in conjunction with the officers' threats and the coercive atmosphere of the police station caused him to render the statements against his will. Brown further argues that since he was 17 years old at the time of arrest, a juvenile officer should have been contacted during the

time Brown was taken into custody prior to the time he signed the handwritten statement.

Whether a statement is voluntarily given depends on the totality of the circumstances. (*People v. Sledge* (1989), 183 Ill. App. 3d 1035, 539 N.E.2d 1312, citing *People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228.) The test is whether it has been made freely, voluntarily, and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed. (*People v. Martin*, 102 Ill. 2d 412, 466 N.E.2d 228.) The finding of the trial court on the voluntariness of a confession will not be disturbed unless it is against the manifest weight of the evidence. *People v. Davis* (1983), 95 Ill. 2d 1, 447 N.E.2d 353.

■ In the present case, Grefsheim testified that Brown was advised of his constitutional rights and that he was never physically or verbally abused or threatened. Grefsheim stated that he did not abuse Brown's injured hand. Brown did not request an attorney, nor did he indicate that he wished to remain silent or ask to speak with his mother. Markham and Glyn corroborated the testimony of Grefsheim. Also, Detectives Regan and Patrick Garrity testified that Brown was advised of his constitutional rights, and that he was never struck or threatened. Prior to the time that Brown gave a statement to the assistant State's Attorney, he had again been advised of his constitutional rights. That statement was reduced to writing, and Brown initialed each page.

Applying the "totality of the circumstances" test to the present case, we find sufficient evidence to support the trial court's finding that Brown's statement was indeed voluntary. Therefore, we will not disturb that finding upon review.

■ Brown's claim that his parents should have been notified and that he should have been taken to a juvenile officer "without unnecessary delay" pursuant to the Juvenile Court Act (Ill. Rev. Stat. 1983, ch. 37, par. 703—2) fares no better. In *People v. Visnack* (1985), 135 Ill. App. 3d 113, 481 N.E.2d 744, the 17-year-old defendant was arrested and charged with murder. This court held that the police were not statutorily required to notify defendant's parents as he was not arrested pursuant to a petition in juvenile court; instead, he was simply arrested for murder and thus subject to the jurisdiction of the criminal courts. In the instant case, wherein defendant was also taken into custody because of his suspected involvement in the murder of the deceased and not because of a juvenile court violation, there was no need to contact the juvenile authorities.

We move now to Sevier's contention that his conviction for murder and attempted armed robbery must be vacated because they are legally inconsistent with the jury's verdict of not guilty on the offense of armed violence. As support for his position, defendant cites *People v. Frias* (1983), 99 Ill. 2d 193, 457 N.E.2d 1233, in which the defendant was acquitted of murder, but found guilty of armed violence based on the felony of murder. Our supreme court reversed defendant's conviction without remanding for a new trial, holding that to retry defendant on a charge of armed violence would unconstitutionally cause defendant to relitigate essential elements of murder of which he previously had been acquitted.

■ We find, however, that we need not reverse on this issue because the present case is factually distinguishable from *Frias*. In this case, defendant was found guilty of murder and armed robbery, which is the reverse of the findings in *Frias*. In *People v. Barnard* (1984), 104 Ill. 2d 218, 470 N.E.2d 1005, our supreme court held that verdicts of guilty of murder and not guilty of armed violence based on murder were not legally inconsistent. The finding of not guilty of armed violence based on murder is not a finding that the defendant did not commit murder; rather, it may be construed as an expression of lenity, which, of course, does not render the verdicts legally inconsistent. *People v. Barnard*, 104 Ill. 2d 218, 470 N.E.2d 1005.

Brown next posits that his conviction for armed violence must be vacated because it constitutes an impermissible double enhancement of the underlying offense of attempted armed robbery. However, in view of our remand to the trial court, we need not reach the merits of this issue for it will be considered again at Brown's new trial.

We next address whether defendants were not proved guilty of armed robbery because the State produced no evidence other than defendants' statements as corroboration for that offense. Defendants correctly cite *People v. Lambert* (1984), 104 Ill. 2d 375, 472 N.E.2d 427, as support for their position that the *corpus delicti* of an offense cannot be proved by the defendant's confession alone; there must be either some independent evidence or corroborating evidence outside of the confession which tends to establish that a crime occurred.

■ Upon our review of the record, we find that such corroborating evidence exists. The deceased's widow, L.A. Young, testified that the deceased carried his wallet on a regular basis, and that every time he came to her house, he had his wallet in his back pocket. Additionally, Boston testified that at approximately 6 a.m., a man bought a newspaper from him and began walking in a westerly direction on 71st St. Shortly thereafter, two men approached the newsstand,

bought a newspaper, and continued walking in the same direction that the first man had travelled. Seconds later, Boston heard the sound of gunshots emanating from the direction the first man had walked. Boston recognized the deceased as the first man who had approached the newsstand to whom he had sold a newspaper. We find that this independent evidence provides sufficient corroboration for defendants' statements in which they said they approached the deceased with the intent to commit a robbery.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and remanded for a new trial in accordance with our directions.

Reversed and remanded with directions.

LaPORTA and RAKOWSKI, JJ., concur.