THIRD DIVISION
 March 31, 1997



1-96-0574

THE PEOPLE OF THE STATE ) Appeal from
OF ILLINOIS, ) the Circuit Court of
 ) Cook County.
 Plaintiff-Appellee, )
 ) 
 v. ) 
 )
FABIAN PICO, ) The Honorable
 ) Ronald A. Himel,
 Defendant-Appellant. ) Judge Presiding.
 

 Justice Leavitt delivered the opinion of the Court:
 Following a bench trial, the defendant, Fabian Pico, was
found guilty of first degree murder on an accountability theory. 
The trial judge sentenced him to 35 years imprisonment. The
defendant, who was 16 years old at the time of the offense,
contends that the trial judge should have suppressed his
confession because the police failed to make a reasonable attempt
to notify his parents, as required by section 5-6(2) of the
Juvenile Court Act of 1987 (the Act). 705 ILCS 405/5-6(2) (West
1994). 
 On May 30, 1994, John Smith and his brothers, Lawrence and
Charles, returned from a fishing trip. During the late evening,
they were sitting with their friend, Joe White, on the porch in
front of White's house located at 3237 62nd Street in Chicago. 
At around 11 p.m., John noticed some members of the "2-6" street
gang nearby. One of the gang members, Cricket, who was riding a
bicycle, approached the group and was talking with them. 
Lawrence bet Cricket that he could "catch him on his bike." John
watched as Lawrence chased Cricket down the street. Shortly
thereafter, shots rang out, and Lawrence came running back. John
began running west on 62nd Street, and a man firing a gun chased
him. John ran through a gangway toward a fence and climbed it. 
As he did, he turned his head and saw that the gunman, who had a
bandana covering his face, was directly behind him with the gun
pointing at his back. John dropped to the ground, apparently on
the other side of the fence, and escaped. John then returned to
the front of White's house, where he found his brother, Charles,
laying dead on the ground. 
 Lawrence Smith testified to the same effect. He had been
sitting at Joe White's house with his brothers, John and Chuck,
as well as White. They were drinking beer, when all of a sudden,
Lawrence heard gunshots, and "some guy" came running from across
the street firing a gun. The gunman had a bandana over his face. 
As the gunman approached, Lawrence dropped to the ground and told
the assailant "I am not in a gang." The gunman looked at
Lawrence, then turned and headed down a gangway, shooting as he
left. After the shooting was over, the gunman came running back
and crossed the street, where another person was waiting for him. 
The two then fled. Lawrence got up off the ground and saw Chuck
walking out of the gangway by White's house. Chuck told Lawrence
that he had been shot. Chuck fell to the ground, face-down. 
Lawrence approached him, turned him over and saw a bullet hole in
his chest.
 On May 31, 1994, Dr. Lawrence Coga examined the body of
Charles Smith. His stipulated testimony included these findings:
Charles Smith suffered a "single penetrating gunshot wound to the
chest. No exit wound was identified. That a copper coated
bullet was recovered from the left lower back. *** [T]he gunshot
wound to the chest, which lacerated the skin, aorta, diafram
(sic), spleen and kidney, was the cause of death."
 The State and the defendant also stipulated to the testimony
of Detective Kenneth Boudreau of the Chicago Police Department. 
His testimony had been admitted previously during a hearing on
the defendant's motion to suppress his confession. Boudreau
testified that on September 10, 1994, he was assigned to Area One
Violent Crimes. On that day, he met with the defendant, who at
the time had been brought in as a witness who might have
information about the death of Charles Smith. 
 That evening, Detective Boudreau and his partner spoke with
the defendant twice. They did not advise him of his Miranda
rights before the first conversation. Before that discussion,
the defendant had informed the police that he was a witness to
the shooting. During the questioning, however, it became
apparent to Detective Boudreau that the defendant "was culpable,
at which time we terminated our interview."
 After terminating the interview, Detective Boudreau
attempted to telephone the defendant's mother. The defendant
supplied the telephone number. Boudreau's effort was
unsuccessful. Boudreau acknowledged that the report he filed
failed to indicate that he attempted to notify the defendant's
parents that the defendant was in custody. In any event, before
resuming his questioning, Boudreau summoned a youth officer. 
When the youth officer arrived, about an hour and forty-five
minutes later, Boudreau read the defendant his Miranda rights. 
Questioning resumed at this point.
 Assistant State's Attorney Kathy Dietz testified that she
was also summoned to Area One on September 10, 1994. She arrived
there at 11:15 p.m. When she arrived, she spoke with Detective
Boudreau and his partner, Detective Halloran. At that time she
learned the identity of the defendant and that he was in custody.
She met the defendant at 11:45 p.m. and immediately advised him
of his Miranda rights. She also read him his rights as a
juvenile--that he had the right to have a parent or youth officer
present during questioning and that depending on the charge, he
could be tried as an adult. The defendant agreed to speak with
Dietz. Juvenile Officer Hall was also present. They spoke for a
total of forty-five minutes during the next few hours. The
defendant was not handcuffed during the interviews.
 At approximately 3 a.m., Dietz transcribed the defendant's
statement. Dietz identified the defendant in court as the person
whose statement she transcribed. After she finished writing the
statement, the defendant reviewed, corrected and signed it. The
substance of the defendant's statement was as follows.
 The defendant had been a member of the Ambrose street gang
for three to four years. On May 30th, 1994, he was with Ricky,
another Ambrose street gang member. The two were at 62nd and St.
Louis when they were "jumped" by a group of 2-6ers. The Ambrose
street gang and the 2-6 street gang are rivals. The defendant
and Ricky decided to seek retaliation, and he stated that they
were going to jump the 2-6ers who jumped them earlier if they
found them. At one point during the night, they saw the guys who
jumped them, but they ran and got away.
 The defendant went to a fellow gang member's house, where he
met George. George is a 'gunner' for the Ambrose gang, someone
who does shooting for the gang. The defendant told George that
he and Ricky were jumped by the 2-6ers. George told the
defendant that they were going to get even with the 2-6ers for
jumping the defendant and Ricky. They would go to 59th and
Rockwell. There, the defendant would walk up and down the block
to see if any 2-6ers were out. The defendant was supposed to
inform George where the 2-6ers were. The defendant would then
distract the 2-6ers by "talking shit" to them. Then, George
would sneak up and shoot them. Once the shooting was over George
and the defendant would return to George's house. George was
going to take care of getting rid of the gun. At this time,
George and the defendant left the house.
 Later, the defendant and George walked to 62nd and Kedzie. 
As they were walking George said "if they are *** out there,
let's pop them." George told the defendant he had a gun and that
the defendant should watch for police. George then pulled the
gun out of his waist and showed it to the defendant. At that
time, the defendant knew that George was going to shoot the 2-
6ers as revenge for jumping the defendant and Ricky earlier that
day.
 The defendant and George approached 62nd Street just west of
Kedzie. They did not see any 2-6ers there. So they walked
together down 62nd Street. The defendant heard someone yell out
"2-6 A K," which the defendant knew to be 2-6 gang members
yelling out their gang affiliations. "A K" means Ambrose killer. 
The defendant then saw group of 2-6ers standing on the other side
of the street. The defendant said "Fuck you, T S K" to the 2-
6ers. "T S K" means 2-6 killer. At this point, George pulled a
bandana up over his face, pulled the gun out of his waist band
and started shooting. George shot in the direction of the 2-6ers
about three times. George then ran toward them and shot three
more times. The defendant and George then ran to George's house.
 The trial judge found the defendant guilty upon this
evidence. The defendant contends that his statement should have
been suppressed because the police did not make a reasonable
effort to notify his parents that he was in custody, as required
by section 5-6(2) of the Act. 705 ILCS 405/5-6(2). Section 5-
6(2) states in pertinent part:
 "A law enforcement officer who takes a minor into
 custody without a warrant under Section 5-5 shall, if
 the minor is not released, immediately make a
 reasonable attempt to notify the parent or other person
 legally responsible for the minor's care***; and the
 law enforcement officer shall without unnecessary delay
 take the minor to the nearest juvenile police
 officer***."
The trial judge denied the defendant's motion to suppress his
statement, finding, based on the testimony of Detective Boudreau,
that the requirements of section 5-6(2) had been satisfied.
 Initially, the State contends that section 5-6(2) does not
apply to the defendant, because he was in custody as a murder
suspect and was, therefore, not a "delinquent minor" who benefits
from the protection in the Act. We disagree. Section 5-5 of the
Act, to which section 5-6(2) refers, provides that "[a] law
enforcement officer may, without a warrant, take into custody a
minor *** whom the officer with reasonable cause believes to be a
delinquent minor." 705 ILCS 405/5-5(1)(a). Section 5-3(1) of
the Act defines "delinquent minor" as "any minor who prior to his
17th birthday has violated *** any *** state law." 705 ILCS
405/5-3(1). The State correctly notes that section 5-4(6)(a)
exempts certain minors from the definition of delinquency as set
forth in section 5-3; however, we do not believe the language of
section 5-4(6)(2) supports the proposition that the defendant was
exempt at the time Detective Boudreau began and continued to
question him. 
 Section 5-4(6)(a) states that "[t]he definition of
delinquent minor under Section 5-3 of this Act shall not apply to
any minor who at the time of an offense was at least 15 years of
age and who is charged with first degree murder***. These
charges and all other charges arising out of the same incident
shall be prosecuted under the Criminal Code of 1961." (Emphasis
added) 705 ILCS 405/5-4(6)(a). We believe that the plain
language of section 5-4(6)(a) indicates that its exemption is
triggered only when the minor has been charged. Until that
point, the minor retains the protection of the Act. This is the
only logical interpretation of section 5-4(6)(a), for until such
time as the minor is charged, the State cannot know whether he
will be tried pursuant to the Criminal Code as an adult or as a
delinquent minor under the Act.
 The State relies primarily on the decision in People v.
Sevier, 230 Ill. App. 3d 1071, 598 N.E.2d 968 (1992), contending
that the Act does not apply to a minor who is taken into custody
and subsequently charged with murder. In Sevier, this court held
that police were not required to follow the parallel provisions
of the former Juvenile Court Act (Ill. Rev. Stat. 1983, ch. 37,
par. 701-1 et seq.) requiring both parental notification and the
presence of a juvenile officer during custodial interrogation of
a 16 year-old murder suspect. The court reasoned that the
defendant had been arrested because of his suspected involvement
in the murder "and not because of a juvenile court violation." 
Sevier, 230 Ill. App. 3d at 1084. In reaching this result, the
court in Sevier relied on People v. Visnack, 135 Ill. App. 3d
113, 481 N.E.2d 744 (1985); however, in Visnack, the defendant
was apparently already 17 years old at the time he committed
murder. Accordingly, he was simply not subject to the terms of
the Juvenile Court Act (see Ill. Rev. Stat. 1979, ch. 37, par.
702-7), and the court so held. Visnack, 135 Ill. App. 3d at 126.
 We consider the holding in Sevier to constitute an unfounded
application of the holding in Visnack to minors under age 17 who
clearly fall within the ambit of the Act's protection. Cf.
People v. Cole, 168 Ill. App. 3d 172, 179, 522 N.E.2d 635 (1988)
(recognizing that the former Juvenile Court Act requires police
to attempt to notify parents that their child, who was being
interrogated in a murder case, is in custody). Accordingly, we
hold that under section 5-4(6)(a), a minor being held in custody
pursuant to section 5-5 does not lose the protection of the Act
until such time as he is charged with one of the section 5-
4(6)(a) offenses. In this case, the defendant was not charged
with murder at the time he was being questioned. That being the
case, he was nothing more than a possible delinquent minor at the
time he was questioned. Therefore, section 5-6(2) of the Act
applied and required that the police attempt to notify the
defendant's parent. 
 That having been said, we will not disturb the trial judge's
ruling denying a motion to suppress a defendant's statement
unless it is against the manifest weight of the evidence. People
v. Brown, 182 Ill. App. 3d 1046, 1051, 538 N.E.2d 909 (1989). 
 Relying on People v. McGhee, 154 Ill. App. 3d 232, 507
N.E.2d 33 (1987), the defendant contends that Detective
Boudreau's single attempt to phone his parents was not a
reasonable attempt to notify under the statute, rendering his
statement involuntary. In McGhee, a police officer left a
business card with the defendant's uncle at the time the officer
took the defendant into custody. Without analysis, the court
simply stated this was an insufficient attempt to notify the
defendant's mother. McGhee, 154 Ill. App. 3d at 236. 
Nonetheless, the court affirmed the denial of the defendant's
motion to supress his confession on fourth amendment grounds
because violation of the statute did not constitute a per se
constitutional violation. 
 Here, the defendant concedes that a violation of section 5-
6(2)'s notification procedures does not, in and of itself, render
his confession involuntary. Rather, he acknowledges that a
violation is merely a part of the totality of the circumstances
which a court must examine to determine whether the statement is
freely given. See Brown, 182 Ill. App. 3d ay 1052. Aside from
the alleged violation of the notification procedures in the
statute, the defendant offers no ground upon which his statement
should have been suppressed. Thus, in essence, the defendant has
challenged the voluntariness of his confession premised solely
upon an alleged violation of the Act, a challenge he has
implicitly conceded has no merit.
 We note that during the defendant's interrogation, a youth
officer was present, as required by section 5-6(2). Furthermore,
no allegation of coercion, abuse or other circumstance which
would undermine the voluntary nature of the statement has been
asserted by the defendant. To the contrary, the defendant
received appropriate Miranda warnings, was not handcuffed,
received beverages and was offered food. His statement
acknowledged that he had been treated well by the police and
Assistant State's Attorney Dietz. The totality of the
circumstances support a finding that the defendant's confession
was voluntarily made. For these reasons we affirm the denial of
the defendant's motion to suppress his statement.
 The defendant also contends that the 35 year prison sentence
imposed by the trial judge was excessive "considering [his] youth
in terms of his rehabilitative potential and his limited intent
and involvement in the shooting." In support of his argument,
the defendant cites cases in which a reviewing court determined
to reduce a sentence imposed on a relatively youthful offender.
 A trial judge may sentence a defendant convicted of first
degree murder to a term of imprisonment ranging between 20 and 60
years. 730 ILCS 5/5-8-1(a)(1). The length of a sentence is a
matter largely within the discretion of the trial judge. People
v. Illgen, 145 Ill. 2d 353, 369, 583 N.E.2d 515 (1991). We will
not disturb a sentence if, as here, it is within the statutory
guidelines unless the trial judge relied upon improper factors in
imposing the sentence. People v. Strader, 278 Ill. App. 3d 876,
663 N.E.2d 511 (1996). 
 Contrary to his assertion, the defendant was an active
participant in the murder of Charles Smith. Charles Smith was an
innocent bystander to a street gang feud. The record in
aggravation established that Smith was engaged to be married and
was the father of three young children. The defendant had a
significant history of criminal conduct as a juvenile. He had
also continued his gang activity while in custody during the
pendency of his trial. As a result, the trial judge concluded
that the defendant had little remorse for his actions, although
the judge did consider the defendant's statement during the
sentencing hearing. Under the circumstances, we cannot conclude
that the judge abused his discretion.
 Affirmed.
 Gordon, J., and Cahill, J., concur.