THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL LaCOUR, Defendant-Appellant.

First District (4th Division)   No. 1—90—2796

Opinion filed March 31, 1993.

Kathryn Hall, of Hall & Kurz, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Jon King, Assistant State's Attorneys, of counsel), for the People.

JUSTICE JOHNSON delivered the opinion of the court:

Defendant, Michael LaCour, was tried in a separate but simultaneously conducted bench trial with Kathy Trevino in the circuit court of Cook County. Thereafter, defendant was convicted of two counts of first degree murder (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), (a)(2)), and armed violence (Ill. Rev. Stat. 1987, ch. 38, par. 33A—1), and sentenced to 25 years' imprisonment and to 3 years' mandatory supervised release.

On appeal, defendant contends that (1) the trial court erred in partially denying his pretrial motion to suppress; (2) he was not proved guilty of first degree murder; and (3) he was improperly convicted of two counts of murder.

We affirm as modified.

Defendant was charged with three counts of murder, one count of armed violence, one count of residential burglary, and one count of conspiracy, all in relation to the murder of Frank Trevino. Prior to trial, defendant moved to suppress physical evidence and post-arrest statements he gave to police concerning the victim's death. At the suppression hearing, defendant testified that on May 12, 1988, at approximately 11:45 a.m., school officials at St. Rita High School in Chicago removed him from class and took him to the office. There, two Chicago police detectives arrested defendant for murder and advised him of his *Miranda* rights. Defendant said he understood his rights and was then taken to the police station. Defendant testified he was not permitted to telephone his parents.

Defendant also testified that while en route to the police station, he exercised his right to remain silent despite the officers' inquiries about the murder. At the police station, defendant was placed in an interview room where an officer asked whether it was a contract killing or self-defense. Defendant told the officer he wanted an attorney.

The questioning ceased but the officers remained in the room. Moments later, the questioning resumed and defendant was again asked whether it was self-defense or a contract killing. Defendant responded: "[N]o, I hadn't planned on shooting him, and I guess it would be considered self-defense because of what happened." The officers then left the room.

Defendant further testified that 20 minutes later an officer entered the room and asked about the murder weapon. Defendant stated the gun was in his room at home. The officer left and returned approximately one-half hour later with a gun defendant denied was used to shoot the victim. The officer left and later returned to inform defendant that the police could not locate the murder weapon. At the officer's suggestion, defendant telephoned his parents and his father eventually found the gun.

According to defendant, he next spoke with attorney John Egan, who told defendant not to speak with anyone. Minutes after attorney Egan left, an officer entered the room with Assistant State's Attorney Catherine Quattrocchi, who had defendant sign a form containing his *Miranda* rights. Defendant then told Quattrocchi he wanted a lawyer. As Quattrocchi began to leave, the officer asked defendant to tell her what he had told the officers. Defendant gave Quattrocchi the same statement he gave to the police.

Also at the suppression hearing, Chicago police detective William Kelly testified that he and his partner arrested defendant at St. Rita High School. After receiving his *Miranda* rights, defendant telephoned his parents and was then taken to the police station. Responding to defendant's inquiries during the ride to the station, the detectives indicated they would speak with defendant later at the station.

At the police station, the officers placed defendant in an interview room and again advised him of his *Miranda* rights. Defendant stated he understood but did not request an attorney. Rather, defendant provided the detectives with a brief statement regarding the victim's death. Detective Thomas Ptak then entered the room and read defendant his rights. Defendant gave Detective Ptak a second statement concerning the victim's death.

Next, the officers asked defendant if they could search his car. Defendant signed a consent form and Detective Kelly left to search defendant's car. Approximately five minutes later, Assistant State's Attorney Quattrocchi arrived and advised defendant of his *Miranda* rights. Defendant indicated he understood his rights.

John Egan also testified at the suppression hearing that at approximately 12:30 p.m. he arrived at the police station and advised

police detective Roy Kwilos that he represented defendant. The detective led Egan to a room where defendant was speaking with Detective Ptak and Assistant State's Attorney Quattrocchi. Egan spoke with defendant alone for 15 to 20 minutes. Before he left, Egan instructed the officer that no one else should speak with defendant.

Detective Craig Cegielske testified that on May 12, 1988, at approximately 2:45 p.m., defendant called out from the interview room that he wanted to make a telephone call. The officer led defendant to another room containing a telephone. On the way, defendant walked past a .44-caliber revolver sitting on a table and claimed that the revolver was not the gun he used to shoot the victim. Defendant said he shot the victim with a .45-caliber automatic. Defendant then telephoned his parents, who found the murder weapon. Detective Cegielske later went to the LaCour home and recovered the .45-caliber automatic.

After the suppression hearing, the trial court denied defendant's motion as to all statements made prior to his attorney's arrival at the station. The trial court reasoned that the statements were voluntarily made and were not the result of improper police procedures. The trial court, however, granted defendant's motion with respect to all statements and evidence obtained after attorney Egan's appearance.

Later at trial, the evidence established that Kathy Trevino and the victim were married in 1984. In May 1987, Kathy began working at a restaurant in Berwyn, Illinois. Defendant also worked at the restaurant. In the spring of 1988, Kathy and the victim were seeking to obtain a divorce. Several of Kathy's co-workers testified at trial concerning their conversations with Kathy about her marital problems. Defendant was present during some of Kathy's discussions with co-workers regarding her divorce and alleged beatings by the victim.

Co-worker Sherry Cruz testified that Kathy often spoke about fights she had had with the victim. During one conversation, Kathy mentioned that the victim would not agree to the divorce or allow her to have custody of the children. Co-worker Ernest Besaw testified he was also present when Kathy mentioned that the victim was going to take away her children and how she wished the victim were dead. Co-worker Michael Paladines testified that Kathy told him of her disappointment because she would not see any of the victim's inheritance money because of the divorce.

Co-worker Ray Yanez testified that while talking with co-workers in the restaurant parking lot Kathy said something like, "Mike, I wish my husband was dead. Mike[,] I want my husband dead or Mike, would you kill my husband." In response, defendant said, "[Y]eah,

sure." About 15 minutes later into the conversation, defendant reached in his car and grabbed a gun wrapped in a towel. According to the witness, when defendant unwrapped the gun, Kathy said, "[W]ill that do it." Defendant replied that the gun would leave a hole in something.

Also at trial, John Gavin, a civilian police dispatcher, testified that on May 12, 1988, he lived at 5837 South Rockwell in Chicago. At approximately 12:05 a.m. that day, Gavin was walking near his home when he noticed a person matching defendant's description sitting inside a car parked nearby with its engine running. As Gavin walked past the car, he and the person inside stared at each other. Gavin later identified the car as the car owned by defendant's father.

Raimondo Martenez testified that on May 12, 1988, he lived at 5828 South Rockwell in Chicago. On that day, he returned home from work sometime between 1:30 a.m. and 1:45 a.m. About 15 minutes later, Martenez heard "five or six" slow-paced gunshots. Martenez testified that the shots happened over a "slow period of time."

Detective Ptak testified that at approximately 3:30 a.m. on May 12, 1988, he was assigned to investigate a shooting at 59th and Rockwell Streets in Chicago. After arriving at the scene, Officer Ptak saw the victim lying dead in the curbway at 5853 South Rockwell. Officer Ptak recovered a spent .45-caliber bullet from the victim's front shirt area, but he did not find any shell casings near the scene. During further investigation, Detective Ptak spoke to the victim's mother and grandmother and learned of the Trevinos' marital problems. Detective Ptak later spoke with Kathy, who agreed to cooperate with the authorities. Following Detective Ptak's conversation with Kathy, police officers went to St. Rita High School to arrest defendant.

Dr. Robert Kirschner, a forensic pathology expert, testified that an autopsy performed on the victim's body revealed no evidence of close-range firing. Dr. Kirschner further opined that the multiple gunshots which caused the victim's death were fired at least 18 to 24 inches from the victim's body.

Prior to the close of the evidence, the prosecution nol-prossed the residential burglary count against defendant. Subsequently, the trial court granted defendant's motion for a directed verdict on the single count charging murder during the course of a residential burglary. Following closing arguments, the trial court found defendant guilty of two counts of first degree murder and armed violence. The trial court subsequently denied defendant's motion for a new trial. After the sentencing hearing, defendant was sentenced to a 25-year prison term and to 3 years' mandatory supervised release. This appeal followed.

Defendant first contends that the trial court improperly denied in part his motion to suppress both physical evidence and statements he made to police concerning the murder. Defendant argues that the statements were obtained after he requested an attorney, and also that the statements were not voluntarily made.

Whether an accused's post-arrest statements are admissible depends on whether the State establishes by a preponderance of the evidence that statements were voluntarily made, *i.e.*, that the accused waived his privilege against self-incrimination and his right to counsel. (*People v. Smith* (1990), 199 Ill. App. 3d 839, 846.) To determine whether a statement was voluntary, a trial court must consider the totality of the circumstances including defendant's age, background, education, experience, and the conditions and circumstances of the interrogation at the time the waiver occurred. (*Smith*, 199 Ill. App. 3d at 846-47.) A statement is considered voluntary if made without compulsion or inducement, and if the accused's will was not overcome at the time he confessed. (*People v. Jones* (1990), 196 Ill. App. 3d 937, 957.) On review, a trial court's finding of voluntariness will not be disturbed unless it was against the manifest weight of the evidence. *Jones*, 196 Ill. App. 3d at 957.

■ Our review of the record convinces us that the trial court properly denied defendant's motion to suppress with respect to evidence obtained prior to his attorney's appearance at the police station. First, based on the evidence, we believe the trial court correctly found that defendant had not requested an attorney. In considering a motion to suppress, the trial court determines witness credibility. (*People v. Mackey* (1990), 207 Ill. App. 3d 839, 860.) Here, the trial court's decision not to believe defendant's version of the events was supported by the evidence.

At the suppression hearing, defendant testified that when arrested at school he was not allowed to telephone his parents and that he requested an attorney twice before making the statements to police. Defendant further testified that police officers had him unwittingly sign a form which mentioned nothing about permission to search his car. In contrast, Detective Kelly testified that defendant called his parents prior to being transported to the police station. Also, several police officers testified that defendant did not request an attorney before attorney Egan arrived at the police station. On cross-examination, defendant admitted he understood at the time he signed the search form that he was giving his permission for the officers to search his car. Given the admitted discrepancies in defendant's testi-

mony, we do not believe the trial court's finding that defendant had not requested an attorney to be erroneous.

Second, we find that the evidence supported the trial court's determination that defendant's statements were voluntary. Where an individual has been admonished of his rights and indicates that he understands them, his giving of a statement without requesting a lawyer evidences his decision to waive a known right. (*People v. Jones* (1990), 196 Ill. App. 3d 937, 961.) Here, the evidence demonstrates that defendant was given *Miranda* rights twice before making his first statement to Officer Kelly concerning the murder. Defendant was given his *Miranda* rights again each time before he made a second statement to Detective Ptak, and a third to Assistant State's Attorney Quattrocchi. Defendant's decision to speak supports the conclusion that he voluntarily waived his right to remain silent.

In ruling on defendant's motion, the trial court found that the statements defendant made before his attorney arrived at the police station were neither involuntary nor the product of any improper police procedure. Nothing defendant has presented calls into question the trial court's determination of voluntariness. Rather, in considering the totality of the circumstances, we are unpersuaded that the trial court's finding of voluntariness was against the manifest weight of the evidence.

Next, defendant contends his acquittal was warranted because the evidence presented at trial failed to support his conviction for first degree murder. Defendant also argues that the evidence demonstrated either that the shooting was accidental or that his behavior was reckless and, therefore, he was guilty of no more than involuntary manslaughter or second degree murder, respectively. In support, defendant claims that the only evidence presented at trial concerning the circumstances surrounding the victim's death were his post-arrest statements which prove the shooting accidental. We disagree.

At trial, John Gavin, a neighbor of the victim, testified that less than two hours before the shooting he saw a person matching defendant's description sitting inside defendant's father's car near the victim's home. The evidence at trial showed that defendant regularly drove his father's car. The prosecution argued that Gavin's testimony established that defendant stalked the victim prior to the shooting. Also at trial, Raimondo Martenez, another neighbor of the victim who was at home around the time of the shooting, testified that he heard six slow-paced, evenly spaced gunshots. Other evidence showed that some of the shots were fired as the victim lay on the ground.

Moreover, expert testimony revealed that the gunshot wounds which caused the victim's death showed no evidence of close-range firing. Rather, the weapon used to shoot the victim was at least 18 to 24 inches away from the victim's body. Further, testimony presented by Kathy Trevino's co-workers evidenced defendant's plan to murder the victim. During numerous conversations between Kathy and her co-workers in defendant's presence, Kathy stated her desire for her husband's death. On one occasion, following Kathy's statement that she wished her husband were dead, defendant told her, "[D]on't worry about it. Everything is going to be okay." On another occasion, Kathy said she wished someone would kill her husband and defendant laughed and said something to the effect of "just tell me where or when."

After a thorough review of the evidence, we cannot say that no reasonable trier of fact could have found defendant guilty of first degree murder beyond a reasonable doubt. (See *People v. Collins* (1985), 106 Ill. 2d 237, 261.) The trial court, which heard the evidence, assessed the credibility of the witnesses and weighed the evidence, found the evidence sufficient to support defendant's guilt. Upon viewing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could have found defendant guilty of murder. See *Collins*, 106 Ill. 2d at 261.

Since the evidence sufficiently supports defendant's guilt for first degree murder, we need not address his alternative arguments that he was guilty of nothing more than second degree murder or involuntary manslaughter.

■ Finally, defendant contends he was improperly convicted of two counts of murder where, as here, only one death occurred. Citing *People v. Mack* (1984), 105 Ill. 2d 103, the People concede this issue, and we hereby vacate defendant's conviction on a second count of murder under section 9—1(a)(2). (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(2).) Defendant's sentence remains undisturbed.

For the foregoing reasons, the judgment of the circuit court is affirmed as modified and defendant's sentence is affirmed.

Affirmed as modified.

JIGANTI, P.J., and CAHILL, J., concur.